# EXHIBIT B

# In The Matter Of:

*Christianna Bullock v.*
*City of Detroit, Joseph Castro, William Morrison*

*William Morrison*
*Vol. I*
*April 18, 2018*
*William Morrison*

*Court Reporting Services*
*Oakland County, Clarkston, Michigan*
*www.courtreportingservices.org*

Original File Morrison, William.txt
Min-U-Script® with Word Index

Page 0

```
 1                 UNITED STATES DISTRICT COURT
 2                 EASTERN DISTRICT OF MICHIGAN
 3
 4  CHRISTANNA BULLOCK,
 5      Plaintiff,
 6                          Case No. 2:17-CV-12685
 7      -vs-
 8  CITY OF DETROIT, JOSEPH CASTRO,
 9  WILLIAM MORRISON and OTHER UNNAMED
10  DEFENDANTS, in their individual and
11  official capacities,
12      Defendants.
13  _____/
14
15      DEPONENT: WILLIAM MORRISON
16      DATE:    Wednesday, April 18, 2018
17      TIME:    12:28 p.m.
18      LOCATION: City of Detroit Law Department
19              Two Woodward Avenue, Suite 500
20              Detroit, Michigan
21      REPORTER: Ginger K. Hoffman, CSMR-9234
22              Court Reporting Services
23              www.courtreportingservices.org
24
25
```

Page 3

```
 1           T A B L E   O F   C O N T E N T S
 2
 3  W I T N E S S
 4      WILLIAM MORRISON                        PAGE
 5
 6  Examination By Mr. Cabot:  . . . . . . . . . . . 4
 7
 8
 9
10  E X H I B I T S
11      NUMBER       IDENTIFICATION           PAGE
12  None offered.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2
 3      CHRISTOPHER TRAINOR & ASSOCIATES
 4      By:  Mr. Shawn C. Cabot (P64021)
 5      E-mail:  shawn.cabot@cjtrainor.com
 6      9750 Highland Road
 7      White Lake, Michigan 48386
 8      Telephone:  248.886.8650
 9          Appearing on behalf of the Plaintiff,
10
11  CITY OF DETROIT LAW DEPARTMENT
12      By:  Mr. Michael M. Muller (P38070)
13      E-mail:  mullm@detroitmi.gov
14      2 Woodward Avenue, Suite 500
15      Detroit, Michigan 48226
16      Telephone:  313.237.5064
17          Appearing on behalf of the Defendants
18
19
20
21
22
23
24
25
```

Page 4

```
 1              Wednesday, April 18, 2018
 2              Detroit, Michigan
 3              12:28 p.m.
 4                 *   *   *
 5           WILLIAM MORRISON,
 6      after having been first duly sworn to tell
 7      the truth, the whole truth, and nothing but
 8      the truth, was examined and testified as
 9      follows:
10              EXAMINATION
11  BY MR. CABOT:
12  Q.  Will you please state your full name for the record.
13  A.  William Morrison.
14          MR. CABOT: Please let the record reflect
15      that this is the deposition of William Morrison, taken
16      pursuant to notice of counsel and agreement of counsel,
17      and to be used for any and all purposes under the
18      Federal Court Rules and the Federal Rules of Evidence.
19  Q.  (By Mr. Cabot):  Good afternoon.  My name is Shawn
20      Cabot.  I'm one of the attorneys representing
21      Christanna Bullock regarding an incident that occurred
22      on September 2nd, 2015.  I'm going to ask you some
23      questions about that, and maybe some questions about
24      might have happened before that.
25          I'm sure you've had some discussions with
```

**Page 5**

1  your attorney about the deposition and all that, but
2  I'm going to give you a couple ground rules today.
3  Have you ever had your deposition taken before?
4  A.  Yes.
5  Q.  Okay.  So you're probably pretty familiar with the
6  process, but again, I'm going to give you my ground
7  rules.  They're pretty simple.  No. 1, please always
8  make sure that your responses are verbal.  Avoid
9  nodding or shaking your head or shrugging your
10  shoulders.  We need verbal responses; avoid saying
11  "uh-huh" or "uh-uh" or things like that, because that
12  gets lost in translation, and we don't want that to
13  occur.  We all want to make sure that your answer is
14  clear.  So if you do that, I or your attorney may say,
15  "Is that a yes or is that a no?"  I'm not trying to
16  bust your chops when I do that, I'm just trying to make
17  sure that the transcript is clear and accurate and sets
18  forth clearly your testimony is.
19      If I ask you a question that you don't
20  understand or it doesn't make sense to you, I want you
21  to tell me that and I'll rephrase the question.
22  Otherwise if you answer the question, I'll presume you
23  understood the question and I'll hold you to whatever
24  answer you give me.  Also if, at any time, you need to
25  take a break, that's fine.  I just ask that you answer

**Page 6**

1  any question that may be pending before you take that
2  break.
3      Also, your attorney may make some objections.
4  Let him make his objections and then if he does not
5  give you an instruction not to answer the question, the
6  rule of thumb is to go ahead and answer the question.
7      And finally, believe it or not, we can help
8  the court reporter do an even more awesome job than she
9  normally does, and we can do that by not talking over
10  one another.  So you may know what my question is
11  halfway through and in your angst to get out of here
12  will want to answer the question while I'm asking it,
13  but for the sake of the court reporter and in the goal
14  of having a clear transcript, please wait until my
15  question is done before you answer.  And likewise, I'll
16  do my best not to ask another question until I think
17  your answer is completed, okay?
18  A.  Yes, sir.
19  Q.  All right.  Prior to your deposition today, have you
20  discussed this matter with anyone other than your
21  attorneys?
22  A.  No.
23  Q.  Have you reviewed anything in preparation for today?
24  A.  Just my police reports.
25  Q.  Okay.  And for the record, what police reports did you

**Page 7**

1  author?  Is it just one police report, the main one, or
2  did you draft multiple?
3  A.  Just the CRISNET report.
4      MR. MULLER: That's the one there.
5  Q.  (By Mr. Cabot):  Okay.  And that's the two-page CRISNET
6  report, correct?
7  A.  That's correct.
8  Q.  Okay.  And you drafted that or did someone else?
9  A.  No.  Someone else did.
10  Q.  Okay.  What did you draft with your own hand, if
11  anything?
12  A.  I don't recall drafting anything.
13  Q.  Okay.  So the only document you reviewed was the police
14  report by Mr. Gaines, I believe it was?
15  A.  That's correct.
16  Q.  Okay.  With respect to this encounter, did you complete
17  any forms, make any written or oral statements, or
18  anything like that?
19  A.  Not that I can recall, but this is back in 2015.
20  Q.  Have you ever been sued before?
21  A.  Yes.
22  Q.  How many times?  That you recall.
23  A.  Several.
24  Q.  Okay.  More than 10?
25  A.  I would say less than 10.

**Page 8**

1  Q.  And did they generally have a certain theme, like force
2  issues?  Shooting animals?  False arrest?
3  A.  They were similar to this.
4  Q.  So involvement in a raid?
5  A.  Correct.
6  Q.  Did the ones that you recall, which are less than 10
7  that you recall, all involve allegations that you shot
8  an animal?
9  A.  Not all of them, but some of them have.
10  Q.  Okay.  Were the majority of them alleged the shooting
11  of an animal?
12  A.  I don't know if the majority, but several of them did.
13  Q.  If it wasn't alleged that you shot an animal, what were
14  the other general allegations made against you as you
15  understand them?
16  A.  Illegal search/seizure, things of that nature.
17  Q.  Did any of those cases go to trial?  Where you
18  testified, at least.
19  A.  I don't recall testifying to any of those at trial.
20  Q.  Have you ever been the subject of a citizen complaint?
21  A.  Yes.
22  Q.  How many of those?  To which you're aware.
23  A.  I don't know.  I've been a cop for 17 years, so those
24  come quite often.
25  Q.  Do you think more or less than 20?

Christianna Bullock v.              **William Morrison**          William Morrison –  Vol. I
City of Detroit, Joseph Castro, William Morrison                            April 18, 2018

Page 9

```
 1  A.  Probably more than 20.
 2  Q.  More or less than 40?
 3  A.  I'd say around that.
 4  Q.  Okay.  Is there a general theme to those complaints?
 5  A.  Those are just varies complaints.
 6  Q.  Okay.  Anybody ever make a citizen complaint because
 7      you shot their dog?
 8  A.  Yes.
 9  Q.  Okay.  Any of them complain about your demeanor?
10  A.  Yes.
11  Q.  So between shooting dogs and demeanor, do you think
12      that encompasses the majority of the complaints of
13      which you're aware?
14  A.  Sure.  That's fair to say.
15  Q.  What about your demeanor did people not like?  As you
16      recall.
17  A.  I'm sorry.  Could you repeat?
18  Q.  What about your demeanor did people not like such that
19      made a complaint?
20  A.  Oh, I don't recall exactly what their complaint
21      completely was, but it involved demeanor.
22  Q.  Okay.  Were any of those ever found to be substantiated
23      in any way?
24  A.  None of the demeanor complaints, no.
25  Q.  What about shooting dogs?
```

Page 10

```
 1  A.  None of those.
 2  Q.  Any citizen complaint ever been found to be
 3      substantiated?
 4  A.  There was one, I believe.
 5  Q.  And what did that involve and when was it?
 6  A.  There was one last year, I guess, involving a -- this
 7      allegation in that one -- no, that one could have
 8      been -- one of the allegations could have been demeanor
 9      on that, as well.  Sorry.  Demeanor --
10  Q.  Essentially, what did they say you did or didn't do
11      that they didn't like?
12  A.  Search, force.
13  Q.  So it went through some type of review process through
14      the police board?
15  A.  Correct.
16  Q.  And they substantiated what?
17  A.  The demeanor complaint.
18  Q.  And so they said that you acted in a way they didn't
19      like how?
20  A.  Just language.
21  Q.  Okay.  Like what?  The F word or...
22  A.  I mean, just language in general.  I don't know exactly
23      what their -- what their determination of what was used
24      was improper demeanor, but it was sustained.
25  Q.  All right.  Was it sustained in 2017 or sustained this
```

Page 11

```
 1      year?  If you know.
 2  A.  I believe at the beginning of this year.
 3  Q.  Did you get any time off or any type of discipline
 4      associated with that?
 5  A.  Yes.
 6  Q.  What was the nature of the discipline?
 7  A.  Suspension.
 8  Q.  How many days?
 9  A.  Two.
10  Q.  Presumably without pay?
11  A.  Correct.
12  Q.  Are you in a union?
13  A.  Correct.
14  Q.  Did you grieve it?
15  A.  No.  That was the determination.
16          MR. MULLER:  Let me just say that this is
17      irrelevant because it happened after the date involved
18      in our case.
19  Q.  (By Mr. Cabot):  Do you get performance evaluations?
20  A.  Yes.
21  Q.  How often do you get those?
22  A.  Yearly.
23  Q.  Are they written?
24  A.  They're typed.
25  Q.  Okay.  They're put together and compiled in a form,
```

Page 12

```
 1      correct?
 2  A.  That's correct.
 3  Q.  All right.  And you get those once a year?
 4  A.  Correct.
 5  Q.  Do you know how long they're kept in your personnel
 6      file?
 7  A.  I don't.
 8  Q.  Have you ever been ranked less than satisfactory in any
 9      area?
10  A.  I have the highest possible performance review you
11      could have.
12  Q.  Really?
13  A.  Yes.
14  Q.  Wow.  Do they give you a trophy, too?
15  A.  No.  I have those, too, though.
16  Q.  Oh, okay.  Trophies for what?
17  A.  Officer of the year.
18  Q.  When was that, and how many times?
19  A.  I've been officer of the year once.
20  Q.  When was that?
21  A.  2010.
22  Q.  Any other trophies you got that you'd like to tell me
23      about?
24  A.  I've got plenty of departmental citations, medals, won
25      an award.
```

Christianna Bullock v.
City of Detroit, Joseph Castro, William Morrison

William Morrison

William Morrison – Vol. I
April 18, 2018

Page 13

1 Q.  Okay.
2 A.  Combinations.
3 Q.  So I'm assuming when I get your personnel file, I'll
4       just be just awed by that.
5 A.  I don't know what you'll be awed by, but --
6 Q.  Okay.
7 A.  -- there's some things in there.
8 Q.  All right.  Ever get any training on the effectuation
9       of search warrants?
10 A.  Yes.
11 Q.  When's the last training you had regarding that?
12 A.  I'm consistently getting training on that.  The last
13       time maybe a couple months ago.
14 Q.  Okay.  What about before that?
15 A.  I worked at a tactical unit for 12 years, so numerous.
16 Q.  Does it happen yearly or is it sporadic?
17 A.  It's a lot of times.  It's not necessarily an annual
18       thing, but it's -- it's a lot of training.
19 Q.  Okay.  Am I going to find any documented training about
20       search warrants in your file?
21 A.  Yes.
22 Q.  Okay.  And how often am I going to find that documented
23       training that you underwent?
24 A.  I've been through so much.  There's a lot, and if you
25       look up our MCOLES -- which is the Michigan Commission

Page 14

1       on Law Enforcement Standards -- training, there's
2       plenty of training sessions involving search warrant
3       executions, et cetera.
4 Q.  Okay.  So are you telling me they happen every year
5       or is it sporadic?
6 A.  I would say at least that.
7 Q.  Are these things that you get a little certificate for
8       to hang on the wall, or do you --
9 A.  Some of them.  I'm sorry.
10 Q.  Or do you have to sign in for them or what?
11 A.  Both.
12 Q.  Okay.  Are they department mandated, or are they things
13       you do on your own?
14 A.  They were, most of them, under department mandated.
15       Some are extra courses that are put on by your unit.
16 Q.  Who teaches the search warrant classes?  Is that
17       something taught by a lawyer?  A police officer?  An
18       expert you bring out of California or Florida?  Or is
19       it a computer module or what?
20 A.  It's a combination of a lot of things.  Some have been
21       done by the prosecutor's office, the Wayne County
22       Prosecutor's office.  I teach MCOLES certified search
23       warrant classes for some of our academy classes.  I've
24       done that before.
25 Q.  When did you do that?

Page 15

1 A.  I've just done -- just did one of them about a month
2       ago.
3 Q.  What about before that?
4 A.  A year ago, maybe.
5 Q.  And is that through MCOLES or is that -- how is it that
6       you're commissioned to do the training on that?  Is
7       that through an entity or...
8 A.  Through our police academy.
9 Q.  Okay.  Other than the discipline you mentioned, the
10       two-day suspension, any other disciplines,
11       terminations, reprimands you've received?
12 A.  I've been disciplined and suspended one other time for
13       missing court back in maybe, like, 2002 or three maybe.
14 Q.  Okay.  What about the disciplines?
15 A.  That's it.
16 Q.  Okay.  So the 2002, 2003 issue, and then the other
17       issue we spoke about about the demeanor, that's all the
18       reprimands, disciplines, terminations you've gotten in
19       your career; is that correct?
20 A.  Correct.
21 Q.  Any background in the military?
22 A.  No.
23 Q.  I want to go over your education a little bit.  Where'd
24       you go to high school?
25 A.  Warren Woods Tower High School.

Page 16

1 Q.  And when did you graduate from there?
2 A.  '99.
3 Q.  Any post high school education?
4 A.  Yes.
5 Q.  Where was that?
6 A.  Western Michigan University.
7 Q.  And when did you attend there?
8 A.  '99 and 2000.
9 Q.  Did you obtain a degree from where?
10 A.  No.  I dropped out to become a cop.
11 Q.  What were you studying while you were there?
12 A.  Education.
13 Q.  Any other post-high school education other than
14       Western?
15 A.  No.
16 Q.  Okay.  You said you dropped out of Western to become a
17       police officer.  Is that when you went to the academy?
18 A.  That's correct.
19 Q.  Is that the Detroit Police Academy?
20 A.  Correct.
21 Q.  When was that?
22 A.  2001.
23 Q.  And when did you officially begin working with the
24       Detroit Police Department?
25 A.  Well, I mean we're hired --

Christianna Bullock v.     **William Morrison**    **William Morrison – Vol. I**
City of Detroit, Joseph Castro, William Morrison             **April 18, 2018**

---

Page 17

1 Q.  During the academy?

2 A.  Right.

3 Q.  So 2001 to present?

4 A.  Correct.

5 Q.  You're presently employed by them, correct?

6 A.  Yes.

7 Q.  Okay.  Why don't you walk me through a little bit about

8  your career.  Let's start with the present and work

9  backwards.  So presently, what are your job duties or

10  what's your title?

11 A.  I'm a police officer.  I work for the narcotics or

12  major violators unit.

13 Q.  Pretend I don't know what that means.  What does

14  working for that division mean?  What do you do?

15 A.  We investigate narcotics-related crimes and complaints.

16 Q.  Do you currently have any type of rank?  Captain?

17  Lieutenant?  Sergeant?

18 A.  Nope.  Police officer.

19 Q.  You're a police officer.  Okay.

20   How long have you been a part of the

21  narcotics major violations unit?

22 A.  Twelve years.

23 Q.  Now, is that unit department wide for the city, or does

24  each precinct have their own unit?

25 A.  We're a citywide unit, specialized unit.

---

Page 18

1 Q.  Is there just one shift of you guys, or is there

2  multiple shifts in the unit?

3 A.  There's four teams.

4 Q.  And does your team have a name?

5   MR. MULLER: A number.

6 Q.  (By Mr. Cabot):  Or a number?

7 A.  Team Five.

8 Q.  And that -- was that the team you were in back on the

9  day of this incident?

10 A.  Correct.

11 Q.  Okay.  And who was a member of Team Five on the day of

12  the incident?  Besides yourself.

13 A.  Sergeant Roy Harris, officer Jeffrey Wawrzyniak; that's

14  W-a-w-r-z-y-n-i-a-k.

15   MR. MULLER: Is he with Roseville now?

16   THE WITNESS: Yep.  Joseph Castro, Washon

17  Gaines [phonetic], Jennifer Tanguay; T-a-n-g-u-a-y;

18  Ryan Paul.

19 Q.  (By Mr. Cabot):  And is there -- one tends to be the

20  officer in charge on your team?

21 A.  Yeah, Sergeant Harrison, Roy Harris.

22 Q.  Who was the officer in charge of this incident?  And

23  was it Harrison or was it Castro?

24 A.  He's the raid commander.  This was Castro's

25  investigation, though.

---

Page 19

1 Q.  Who was a raid commander?

2 A.  Sergeant Harris.  Sergeant Harris is in charge of the

3  crew, but each individual officer's responsible for

4  their own investigations, so this was officer Castro's

5  investigation.

6 Q.  What is a -- what do you mean by raid commander?

7 A.  Is the person in charge at the raid site.

8 Q.  Okay.

9 A.  It's the ranking officer at the raid site.

10 Q.  But if Castro's in charge of that particular

11  investigation, is it Castro kind of making the calls as

12  to what's going to happen, or is it Harris making the

13  calls?

14 A.  Not necessarily.  When it comes to a raid commander,

15  he's kind of like a -- when critical decisions need to

16  me made at this particular location, he would be the

17  ranking officer in charge of making those decisions.

18 Q.  But other -- but just basic, normal decisions have to

19  be made, it would have been Castro?

20 A.  No.  This was Castro's investigation.  I mean, we're

21  all of equal rank with Castro, so I mean we're all

22  making decisions that particular day, but it's Castro's

23  investigation.  He's in charge of however he obtained

24  this investigation.  This is his search warrant.  He

25  would know the details.

---

Page 20

1 Q.  So how long have you been with Team Five?  You've been

2  with the narcotics unit 12 years.  Have you been with

3  the Team Five 12 years, or...

4 A.  There's a -- I mean, there's been some changes that

5  have been made.  We didn't always have the same team

6  notification, but --

7 Q.  Okay.  And --

8 A.  -- different officers that have been assigned to that

9  particular group, but, I mean --

10 Q.  Tell me in general, how long did you work with these

11  particular folks?

12 A.  I've worked with Sergeant Harris for my entire time at

13  narcotics.  He's been my boss the entire time.  I've

14  worked with -- myself and officer Castro came to

15  narcotics at the same time.  Officer Wawrzyniak I

16  worked with for probably eight, nine years.  Officer

17  Gaines I've worked with for probably the past four to

18  five years.  Officer Tanguay, I've worked with her at

19  narcotics maybe four or five years.  Prior to narcotics

20  I worked with her, as well.

21 Q.  Okay.

22 A.  Officer Paul, I've worked with him for four or five

23  years.

24 Q.  All right.  So you've been with the major violators

25  unit about 12 years.  What'd you do before that?

---

Christianna Bullock v.    **William Morrison**    William Morrison – Vol. I
City of Detroit, Joseph Castro, William Morrison      April 18, 2018

---

Page 21

1 A. Before that, I was assigned the First Precinct Central
2    District. That's it.
3 Q. And doing what? Road patrol?
4 A. Special operations for Central District, which was, at
5    the time, the First and Thirteenth Precincts. I've
6    also worked special operations for the First Precinct.
7 Q. And in special ops, what was the focus? Was it drugs,
8    or...
9 A. Proactive police work.
10 Q. I'm sorry?
11 A. Proactive police work.
12 Q. What does that mean?
13 A. That you're not necessarily responding to police runs,
14    it's your job to go out and proactively find crimes in
15    progress.
16 Q. Okay. Is that where you started off?
17 A. Started at the First Precinct.
18 Q. Yep.
19 A. Yes.
20 Q. As I indicated to you in my preliminary comments, we're
21    here to talk about a raid that took place on
22    September 2nd, 2015. But I want to start a little
23    bit before that.
24        Were you part of any type of surveillance or
25    observations of the address prior to that, at any time?

---

Page 22

1 A. No.
2 Q. Do you know if anyone was?
3 A. I would assume officer Castro was because he was the
4    affiant for the search warrant.
5 Q. Have you ever been an affiant of a search warrant?
6 A. Yes.
7 Q. Okay. Have you ever conducted surveillance?
8 A. Numerous times.
9 Q. Okay. Maybe you can all help me because I may not know
10    all the terminology for this.
11 A. Okay.
12 Q. So you can educate me. Do you guys, when you do
13    surveillance, keep like a surveillance log or an
14    officer in charge log to help kind of remind you what
15    you did on a particular occasion before you do a search
16    warrant?
17 A. It depends on how long the investigation is. Sometimes
18    we do; oftentimes we do.
19 Q. What do you folks call that document?
20 A. Surveillance notes.
21 Q. And I know you can't tell me what officer Castro may or
22    may not put in his surveillance notes, but have you --
23    you've done surveillance notes?
24 A. Yes.
25 Q. And what do you put it them? What do you think's

---

Page 23

1    important to put in them?
2 A. Just depends on what type of investigation you're
3    doing.
4 Q. Well, this one's narcotics.
5 A. On a narcotics related investigation, that could mean
6    a lot of different things. You might be looking at a
7    house, you might be looking at individuals on the
8    street doing street deals, you can be looking at
9    commercial buildings; it just depends on the nature of
10    the investigation.
11 Q. Well, you put notes maybe what you saw on a particular
12    day, right?
13 A. It's possible.
14 Q. Okay. Like if you saw some type of interesting drug
15    transaction at an address you're looking at, maybe some
16    people hanging out that look kind of funny, you might
17    make a note of that?
18 A. I don't know if I'd make a note of people looking
19    funny, but that's your translation of it.
20 Q. Or people that you think might be engaged in some type
21    of criminal activity, you might make a note of what
22    look like, what time it was, what day it was?
23 A. That's possible.
24 Q. Okay. Any -- other than surveillance notes, any type
25    of other documentation you or other narcotics officers

---

Page 24

1    might keep as far as observations or surveillance done
2    on a location prior to the execution of a warrant?
3 A. Yeah. I mean there's other documents, like our
4    activity log, if we're doing them on duty. If we're
5    doing them off duty, like I said, the surveillance
6    notes. Surveillance notes would apply to both on duty
7    and off duty. A shorter-term investigation like this
8    with just a controlled narcotics purchase from a house,
9    might not be a lot of surveillance notes just because
10    the paperwork itself that's generated from the buy
11    would be sufficient for refreshing recollection of what
12    occurred during the investigation.
13 Q. Where are these -- how are these notes usually kept in
14    the normal course of business, as you keep them? Are
15    they handwritten, kept in a file somewhere, or are they
16    typed in a computer system?
17 A. Pertaining to this type of investigation, consistent
18    with this type of investigation where there was a
19    controlled purchase made from a house, a lot of that
20    documentation would be in one of our files that we
21    keep.
22 Q. And when you say files that you keep, you mean like an
23    old-fashioned paper file in a Manila folder somewhere?
24    Is that what you mean?
25 A. Correct. We would keep copies of these documents that

---

Christianna Bullock v.                           William Morrison                William Morrison - Vol. I
City of Detroit, Joseph Castro, William Morrison                                April 18, 2018

Page 25

1    you have, as well as I believe there was a controlled
2    purchase made from this location.  There would be a
3    copy of a request for laboratory examination for
4    whatever narcotics we purchased from that house.
5 Q. That was called a request for laboratory what?
6    Determination?
7 A. Lab analysis for the drugs.
8 Q. And where would these folders or files be kept?  Are
9    they kept at a headquarters?  Are they --
10 A. We have a file cabinet that has files from every
11    investigation and we do.
12 Q. Okay.  And narcotics has a separate headquarters, so to
13    speak, somewhere in the city?
14 A. We have an office yes.
15 Q. Okay.  And I know you're not going to -- I'm assuming
16    you're not going to tell me where that is, correct?
17 A. Not going to do that.
18 Q. Okay.  It's in a city; it's in a building, though,
19    correct?
20 A. Correct.
21 Q. And it's a physical file cabinet in that location --
22 A. That's correct, sir.
23 Q. -- where you keep files on your raids and search
24    warrants and observation notes and all those things,
25    right?

Page 26

1 A. Correct.
2 Q. Okay.  And those would not be things that normally,
3    you're understanding, would be put into the general
4    computer system of the Detroit Police Department; is
5    also accurate?  May or may not be.
6 A. See, here's the thing:  Certain documents involving
7    this case would be kept in that file.
8 Q. Okay.
9 A. Where an officer keeps his individual surveillance
10    notes, that's up to him.  I keep mine one way; some
11    people keep them in their own desk, some --
12 Q. How do you keep yours?
13 A. I keep mine oftentimes in a spiral notebook.  Some
14    people type them.  Some people store them on their cell
15    phone.  Some people store them -- that's up to the
16    individual officer.
17 Q. And what do you guys call these things?
18 A. What's that?
19 Q. These notes that you might keep in a spiral notebook.
20 A. Notes.
21 Q. Okay.  Well, just trying to learn the lingo of you guys
22    so when I make a request for production of documents
23    for specific things, I don't get a response that says,
24    "We don't know what you're talking about."  So I want
25    to get your lingo right.

Page 27

1 A. Yeah.  Just surveillance notes.
2 Q. Okay.  Do you guys keep a file on confidential
3    informants at that location, as well?
4 A. Yes.
5 Q. And how are those -- how are those -- are they called
6    informant cards?  Or what do you call them?
7 A. There'd be -- it's a file pertaining to each individual
8    informant.  Informants have a control officer.
9 Q. What's a control officer?
10 A. Control officer would be the person that initially made
11    that person a registered informant.  They would also
12    know the identity of this particular informant, et
13    cetera.
14 Q. Is -- would that -- and where is that information kept
15    on?  Like a CI card?
16 A. That's kept in a locked area inside of our office.
17 Q. And what's that called?  That information where you
18    talk about the control officer, that person's name
19    and --
20 A. I guess it would be called an informant package.  We
21    call it an SOI pack, which is a source of information
22    pack.
23 Q. And on that source of information packet -- so we have
24    the control officer basically initiates the informant
25    into the business of being an informant, correct?

Page 28

1 A. That's correct.
2 Q. Does that packet usually include their criminal
3    background?
4 A. It would.
5 Q. Okay.  Is that packet -- and I'll phrase this
6    carefully -- is that packet supposed to include every
7    time that informant has been used and whether or not
8    the results of their use has been successful?
9 A. That particular package does not include that, but
10    there are a record of every controlled purchase of
11    narcotics, consistent with this one, that's made.
12 Q. And what would that be?  So let's say we have SOI 1,
13    for example.
14 A. Okay.
15 Q. And so we have this SOI packet, which is basically, as
16    I understand it, the preliminary packet, how SOI 1
17    becomes to be an SOI?
18 A. Correct.
19 Q. And the background on that informant, correct?
20 A. Correct.
21 Q. The name of the officer who registers him, et cetera?
22 A. Yes.
23 Q. Okay.  Let's say this person's used five times, 10
24    times, a hundred times.  All those times that they're
25    used is kept or is supposed to be kept, correct?

Christianna Bullock v.                                           William Morrison                              William Morrison - Vol. I
City of Detroit, Joseph Castro, William Morrison                                                                          April 18, 2018

| Page 29 | Page 31 |
|---|---|

**Page 29**

1  A.  There's a record of every single controlled purchase
2      that's ever made.
3  Q.  Okay.  You associate it with that SOI?
4  A.  It will have that SOI's number.  These SOIs are
5      assigned a number.
6  Q.  Right.
7  A.  That what they're known by, is a number.
8  Q.  Okay.  But I'm curious.  So if I wanted to know all the
9      buys SOI 1, using our hypothetical one in this.
10  A.  Right.
11  Q.  I wanted to know every -- how many times this SOI 1 has
12      been used.  Is there a card or a document that has just
13      specific to that SOI 1 every time they've been used?
14  A.  There is -- I'm not going to say that there's a running
15      total, but that would be ways to figure that out.
16  Q.  And would you do that?  Is it a -- is it called
17      something?
18  A.  There's a tabulation of every single buy that's done,
19      and then you'd be able to see from there which SOI made
20      that particular buy.  So I guess looking through that
21      tabulation, you'd be able to go through from the date
22      that they were signed up and initiated being an
23      informant up until the current date, you would have to
24      look there to see that.
25  Q.  All right.

**Page 30**

1  A.  But it is kept track of.
2  Q.  Okay.  So let me see if I understand this.  So you
3      don't have an SOI card that has every time they've been
4      used as an informant.  There's not like a document that
5      has that.  Is that correct so far?
6  A.  There's a log that shows what -- the activity
7      involving -- what it is the activity mainly -- and
8      this is used for this purpose.  So there's an SOI pack
9      that shows the initiation of the informant.
10  Q.  Yep.
11  A.  Any controlled purchase that we made, or any time that
12      we use department-issued funds to do any undercover
13      activity, there's something called a voucher that has
14      to be filled out.  It's a four-page document detailing
15      the use of the funds.
16  Q.  Usually when it involves money.
17  A.  Correct.  So that's what's -- it's not that they care
18      about what this informant's doing.  They want to know
19      where this money's going.
20  Q.  Right.  But I guess more general than that, I just --
21      here's my question:  If I want to -- and we'll get to
22      this specifically in a bit, but if I just want to know
23      is there one document that if I asked your attorney
24      for -- we won't get into whether or not he's going to
25      give it to me, but if I ask for it -- that says I want

**Page 31**

1      a document that shows every time SOI 1 has been used,
2      there isn't such a document?
3  A.  No, there is.  It's a tabulation -- there's a book that
4      keeps that.  Are you going to get -- are you going to
5      get that book?  No.  I can tell you that now.  They're
6      not going to give you that book.
7  Q.  Well, absent a court order.  So but that's not your
8      issue today.
9  A.  That's not.
10  Q.  But I want to know what it's called.
11  A.  It's a --
12  Q.  What's it called so I can ask for it intelligently?
13  A.  It's SOI --
14  Q.  Tabulation book?
15          MR. MULLER: You ain't getting it.
16          THE WITNESS: Tabulation book.  But they're
17  not going to give it to you.
18          MR. MULLER: You're not going to get it.
19          THE WITNESS: He's not going to give it to
20  you.
21          MR. CABOT: No.
22          MR. MULLER: Over my dead body.
23          MR. CABOT: Well, you know, you're not the
24  judge, so...
25          MR. MULLER: Why would you need it?  How

**Page 32**

1      could you possibly need it?
2          MR. CABOT: Unfortunately, I don't have to
3      answer your questions, Mr. Muller.
4  Q.  (By Mr. Cabot):  So this is called an SOI tabulation
5      book?
6  A.  I mean, if that's the name you want to give it.
7  Q.  Well, I what to know the name you guys call it, because
8      I don't want your attorney saying, "I don't know what
9      you're talking about."
10  A.  We call it a bunch of different things: SOI book,
11      ledger, some people call it -- it just varies from crew
12      to crew.
13  Q.  All right.
14  A.  It's a book that details each time money,
15      department-issued funds is expended for an undercover
16      purchase.
17  Q.  Okay.  What if funds aren't used?  Let's just say your
18      SOI's used for surveillance purposes, drug purposes,
19      but they're not handling money.  Is there a way that
20      you keep track of that?
21  A.  So if an SOI's information was used and it didn't
22      involve a buy, potentially they could be paid for their
23      information.  That would also be in the same book.
24  Q.  Okay.  What if they're not paid?
25  A.  If they're not paid, that information would be

Christianna Bullock v.                     William Morrison                    William Morrison – Vol. I
City of Detroit, Joseph Castro, William Morrison                                April 18, 2018

Page 33

1    detailed, and maybe the information would be used in an
2    affidavit for a search warrant, or just -- I mean, if
3    they choose to give information -- the SOIs call you --
4    these are -- there's no glamorous, you know.
5 Q. No, no. I mean, usually you guys have names for this
6    stuff, so I'm just -- I mean so if I wanted -- if I'm
7    dealing with an SOI who hasn't ever touched greenbacks
8    for the Detroit Police --
9 A. And that's quite often.
10 Q. -- but has given them information and their number has
11    been used in an affidavit for a search warrant and I
12    want to find out how many times this person been
13    used and hasn't handed -- been touched -- hasn't
14    touched money, hasn't been given money, hasn't been
15    paid, and I want to find out how many times they've
16    been used generally, what document am I going to ask
17    for?
18 A. You're going to have to do a freedom of information
19    request for --
20 Q. Well, I'm in litigation, so I'm going to do a request
21    for production.
22 A. Go get a court -- okay, or get a court order.
23 Q. For what document?
24 A. For every -- you're asking me how you would go about
25    doing that?

Page 34

1 Q. No. I'm asking for the name of a document.
2 A. There's no name of a document.
3 Q. Okay.
4 A. I mean, there's no documentation that we have to keep
5    involving every time we use information from an
6    informant. That's not -- there's no document that
7    exists, so if you'd like to get that information, you
8    would have to pretty much subpoena every single search
9    warrant that that officer's done in that time span.
10 Q. Or subpoena every time you used a confidential
11    informant with that specific number?
12 A. There's no way to -- there's nothing to subpoena there.
13    So, again, if that person didn't -- and your question
14    was how would you do it if that person didn't do a buy,
15    anything that didn't involve money, then you would have
16    to just go for that individual search warrant. I mean,
17    we can use information from an informant, minus
18    paying them anything.
19 Q. Sure.
20 A. So that would just be --
21      MR. MULLER: Just to clarify, you're saying
22    you'd have to get every single search warrant from
23    major violators and go through every single search
24    warrant --
25      THE WITNESS: Right.

Page 35

1      MR. MULLER: -- to see if it involved that
2    particular SOI.
3      THE WITNESS: Correct. And some of these
4    SOIs are used by multiple officers, too. It's not one
5    officer, just because have a control officer, that no
6    one else uses them. I mean, they're often used by
7    other officers, too.
8 Q. (By Mr. Cabot): How do you decide which SOI is going
9    to be used in a given case? Let's say a narcotics case
10    where you're going to do a potential search warrant on
11    a house for narcotics. What criteria do you use to
12    choose SOI 1 over SOI 2?
13 A. In -- it depends. There's different types of
14    investigations that you would do. So you have
15    low-level drug dealers, you have high-level drug
16    dealers. To use a low-level drug dealer, for instance,
17    if you called in a complaint and said my next-door
18    neighbor's selling drugs, then the easiest way to get a
19    search warrant on that house would be to get a
20    controlled purchase out of that house or do an
21    undercover buy from that house.
22 Q. So what level was this case?
23 A. This, to me, would seem like a pretty low-level case.
24 Q. And why is that?
25 A. This is just a typical -- reviewing the search warrant,

Page 36

1    this is a typical case where there was more than likely
2    a complaint on this house or some information received
3    that this house sold drugs, and this is a house where
4    they were known to sell drugs, more than likely, to
5    anybody. And a person that's a higher-level drug
6    dealer's not going to just sell drugs from their house
7    or keep drugs, a large amount of stash in this
8    particular house and then sell drugs out of it. So
9    this is normally what we would consider a lower-level
10    narcotics operation.
11 Q. So you've read affidavits for search warrants in your
12    career, haven't you?
13 A. Yes.
14 Q. You understand generally what their purpose is?
15 A. Yes.
16 Q. You understand the language generally contained in it?
17 A. Yes.
18 Q. And you just indicated you read the search warrant in
19    this case, correct?
20 A. I didn't read it, but just looking at it, yes.
21 Q. Okay.
22 A. Or reading some of it, yes.
23 Q. Okay. According to the search warrant, does it
24    indicate that drugs were being sold from inside the
25    home, outside the home, or somewhere else? Or can't

Christianna Bullock v.                    William Morrison                    William Morrison - Vol. I
City of Detroit, Joseph Castro, William Morrison                                         April 18, 2018

Page 37

1    you tell?
2  A.  It says from the location.
3  Q.  What does that mean?
4  A.  To me, that would leave me to believe that it stems
5      from the location, inside of the location.
6  Q.  Okay.  But it doesn't say inside the location, does it?
7  A.  It says from, and that's consistent with what I believe
8      to be inside of the location.
9  Q.  Okay.
10 A.  If it was outside of the location, we wouldn't do a
11     search warrant, we'd just investigate if it was in
12     front of the location.
13 Q.  Well, that's your opinion, but...
14 A.  No.  I'm telling you.  That's not an opinion.  I'm
15     telling you how we would investigate it.
16 Q.  Well, you didn't investigate this one, did you, so you
17     don't know.
18 A.  I'm telling -- you asked what from meant to me.
19 Q.  Okay.
20 A.  And then I told you that if it wasn't from that we
21     wouldn't type a search warrant on a house if it stemmed
22     from the outside of the house.
23 Q.  You wouldn't do it, correct?  But you don't know what
24     Castro may or may not have done because you're not
25     Castro; is that correct?

Page 38

1  A.  I'm not Castro.
2  Q.  All right.  That's all I need to know.  And you didn't
3      draft the affidavit, correct?
4  A.  I didn't.
5  Q.  Okay.  You didn't do any surveillance, correct?
6  A.  I did not.
7  Q.  You didn't do any type of observation on the home prior
8      to the execution, correct?
9  A.  No.
10 Q.  You didn't deal with the SOI in this case, did you?
11 A.  I guess ultimately, you'd have to ask Castro what from
12     means then.
13 Q.  No.  I asked you a question, and my question is:  Did
14     you deal with the SOI in this case?
15 A.  And I answered that earlier, no.
16 Q.  All right.  So, at some point, I'm assuming, you had a
17     pre-raid briefing.
18 A.  Correct.
19 Q.  Okay.  Did that occur at your undisclosed headquarters
20     somewhere?
21 A.  It might have.  It might have occurred elsewhere.
22     Sometimes we brief there.  Sometimes we brief on the
23     street.  We could have been coming from another search
24     warrant prior to this.
25 Q.  In this case, do you know where the pre-raid briefing

Page 39

1      occurred?
2  A.  Sir, this was almost three years.  I can't remember.
3  Q.  Okay.  That's all you've got to tell me.
4          Do you recall when in proximity to the
5      execution of the search warrant that meeting was held?
6      Was it ten minutes?  An hour?  Five hours?
7  A.  I can't tell you exactly when, no.  Generally, it's
8      right before we go to the location, though.
9  Q.  Okay.  Who led the pre-raid briefing?
10 A.  That would have been officer Castro, if it's his search
11     warrant.
12 Q.  Do you recall reviewing any type of documents in
13     preparation for this raid?
14 A.  No.  He just -- and I can't remember the specific
15     briefing, but that's not -- I mean, I can't even
16     remember this briefing, so, no.
17 Q.  Okay.  So you can't remember this particular briefing,
18     but you've already testified in your opinion this is a
19     low-level drug search warrant type situation.  So
20     generally in those types of search warrants, which you
21     yourself classified as low-level, what types of
22     information generally is disclosed or talked about in
23     that pre-raid briefing?
24 A.  This -- just to clarify, I didn't testify this is a
25     low-level -- that this was a low-level search warrant.

Page 40

1      I testified at this was a low-level -- investigation of
2      a low-level narcotics location.
3  Q.  Okay.
4  A.  What type of things would be briefed on would be the
5      location, the route to the location, physical
6      description of the house, and route to the hospital in
7      case anybody got injured, any information involving
8      possible subjects at the location, weapons if known,
9      children if they're at that location, and what we're
10     looking for at that location consistent with what we've
11     bought.
12 Q.  What about animals?
13 A.  That would be listed in the or described in the
14     briefing if we had knowledge of that.
15 Q.  Okay.  I'm going to ask you if you remember any of
16     these things.  I'm assuming I know what your answer is,
17     but if I don't ask it, then I never know, okay?
18 A.  Okay.
19 Q.  So you can just tell me yes, no, or I don't know.
20          Do you recall, with respect to this briefing,
21     whether there was a description of the house?
22 A.  Again, I don't recall this briefing.
23 Q.  Okay.  All right.
24 A.  So I'll just leave -- go ahead.
25 Q.  And again -- so your answer is:  I don't know; is that

Christianna Bullock v.
City of Detroit, Joseph Castro, William Morrison

William Morrison

William Morrison – Vol. I
April 18, 2018

Page 41

1     correct?

2 A.   Correct. Well, no. I mean, I don't recall this
3     briefing.

4 Q.   Okay. Do you remember if there was information given
5     about who owned the house, how long they'd been there,
6     occupants of the house?

7 A.   I'm sure there would have been, but I don't remember.

8 Q.   Okay. Any information about weapons provided?

9 A.   I'm sure there would have been information, but I don't
10     remember.

11 Q.   Okay. Anything that you recall about animals being
12     present or anything like that?

13 A.   Don't recall.

14 Q.   Now, how generally do you find out -- how generally do
15     you know this stuff when it comes to a pre-raid
16     briefing? For example, have you led a pre-raid
17     briefing before?

18 A.   Numerous times.

19 Q.   Okay. Have you advised your team, hey, there's animals
20     in the house, there's dogs in the house, chickens,
21     cats, I don't know what --

22 A.   Yes.

23 Q.   -- antelope, buffalo.

24 A.   Yes.

25 Q.   So how do you learn that information to brief your team

Page 42

1     on it? I mean there's -- is it through surveillance?
2     Is it through external sources? Third parties?

3 A.   It could be all types of information. Would you like
4     examples?

5 Q.   Sure.

6 A.   Okay. Well, you could drive-by a location and be doing
7     surveillance on a location and see the dog sticking its
8     head out the window; you could see the dog in the
9     doorway, you could see a person enter the location a
10     dog could come out, run around the front yard, and go
11     back in the house. You could see beware of dog signs.
12     You could have been to the location before, known that
13     they have dogs there. Your informant could give you
14     that information. It can also be listed in a citizen
15     complaint for the location. There's tons of different
16     ways. You can see footprints in the snow.

17 Q.   Sure. And those are all really kind of common sense
18     things; driving past and you see a dog head in the
19     window. I mean that -- you might see that. And so
20     let's say that happened in a case.

21 A.   Okay.

22 Q.   Would you note that somewhere? Would that be part of
23     your surveillance log we talked about before? Hey, on
24     such and such a day, I drove past subject house on such
25     and such a street, saw a dog head in the window. Would

Page 43

1     you log that somehow? Because, you know, I'm sure
2     you're going to tell me you've been involved in
3     thousands of raids and so you can't possibly remember
4     everything. So do you document stuff like that?

5 A.   Stuff like is documented when it's know, but there's
6     oftentimes that three's a lot of unknowns in these
7     raids.

8 Q.   And you would document that how? If you documented it.
9     On these surveillance log things we talked about
10     before?

11 A.   Not necessarily.

12 Q.   Okay. So how would you document it if not on a
13     surveillance log note?

14 A.   There's a form -- I mean, I guess it would be
15     consistent with -- there's a form that we use.

16 Q.   What's it called?

17 A.   It's called a SOI worksheet. So this form would be
18     used just in basic observations. It's like a
19     fill-in-the-blank sheet.

20 Q.   Okay.

21 A.   Put some basic things on it. It's based on the
22     description of the house. It's like a checklist.
23     Description of the house, the SOI that's used for the
24     buy, his number goes on there. There's checkboxes for
25     children were observed or present. There was --

Page 44

1     there's checkboxes for a dog, weapons, there's a
2     remarks section you would add some extra remarks in
3     there if you wanted to.

4 Q.   Okay.

5 A.   That's one way to do it. And another way to do it is
6     just based off of memory. I mean, I go buy this house
7     and go yeah, I saw a dog in the door. Tell my guys
8     that in the briefing.

9 Q.   How many raids have you personally done? And I'm
10     talking not where maybe you're not the head guy, but
11     how many raids have you done in your career?

12 A.   Over 3000.

13 Q.   Okay.

14 A.   Probably.

15 Q.   So how do you keep them all straight if you don't write
16     it down?

17 A.   Don't write what down?

18 Q.   Specific information about a house, having a dog in the
19     window or kids in the window. I mean, you've done over
20     3000, so you think your memory's going to be good
21     enough to remember at this particular address, I saw a
22     dog and two little babies in a stroller in the house?

23 A.   I mean, if this is a current investigation and that
24     information is pertinent to the safety during entry of
25     that location, prior to that briefing I remember that.

Christianna Bullock v.  William Morrison  William Morrison – Vol. I
City of Detroit, Joseph Castro, William Morrison  April 18, 2018

Page 45

1   So if I was doing an investigation now, we're going to
2   raid it tomorrow and I'm doing a briefing on it and I
3   saw this yesterday, I'd remember that then.  Would I
4   remember that three years later?  No.
5        If it's written down somewhere, then I can
6   refresh my recollection with that.
7  Q.  And let me guess.  This form is probably kept in paper
8   format at your headquarters somewhere in a file, right?
9  A.  That form would probably be in the office file that I
10   referred to earlier.
11  Q.  Okay.  So it's not a computer form, it's handwritten?
12  A.  Correct.  Because it's done in the field.
13  Q.  I understand.  I just want to make sure that when I
14   request it, I mean, I'll know what I'm asking for.
15        MR. MULLER: You ain't getting it.
16        THE WITNESS: It's called a SOI worksheet.
17        MR. MULLER: Well, actually, what I produced
18   for you comes out of that folder.
19        MR. CABOT: I may want to actually see that
20   Manila folder, but we'll cross that bridge when we come
21   to it.
22  Q.  (By Mr. Cabot): So on this particular occasion, you
23   can't remember if there indeed was a pre-raid briefing.
24   You're assuming there was, but you don't have any
25   direct recall of that pre-raid briefing for this search

Page 46

1   warrant; is that accurate?
2  A.  I've never been on a raid where there wasn't a pre-raid
3   briefing, so I'm positive that there was a pre-raid
4   briefing.  I don't remember what was discussed during
5   the briefing, though.
6  Q.  What is your understanding of what you were looking
7   for?  Guns?  Weapons?  Drugs?  Drugs and money?
8   Prostitutes?
9  A.  It's a narcotics search warrant, so I would assume
10   drugs.
11  Q.  Okay.  What type?  Marijuana?  Heroin?
12  A.  Any controlled substance that was in the house.
13  Q.  What is your understanding you were supposed to find?
14  A.  If I can refer to the search warrant, because I don't
15   know offhand.
16  Q.  Okay.
17  A.  According to the search warrant, heroin was purchased
18   from this house.  So we would be looking for at least
19   heroin.  And this search warrant also states that we're
20   looking for all controlled substances; narcotics
21   proceeds, it appears; firearms, and various other
22   things.
23  Q.  How do you know -- how do you know if -- and basically
24   that part of the search warrant, they're all pretty
25   much the same.  How do you know if you go into a house

Page 47

1   and you see a $5 bill laying on the table if that's
2   narcotics proceeds versus a little kid's lunch money
3   for the week?
4  A.  It's not my determination on how forfeiture law works.
5  Q.  Okay.  How -- but you've done that before, right?
6   You've executed search warrants and found money, right?
7  A.  Numerous times.
8  Q.  And you've seized money, correct?
9  A.  Yes.
10  Q.  So how do you determine that the money you find --
11  A.  That's not my determination to make.  That's the
12   judge's determination to make in forfeiture court, not
13   mine.
14  Q.  So basically any nickel and dime or dollar or $5 bill
15   you find in that house, you're taking it and let's let
16   the court deal with it?  Is that what you're telling
17   me?
18        MR. MULLER: Assuming you find drugs, right?
19        THE WITNESS: Listen, this search warrant
20   here, which is --
21  Q.  (By Mr. Cabot):  No, I'm not asking about the search
22   warrant.  We're going to get into that in a little bit.
23   I'm asking you generally --
24  A.  Okay.
25  Q.  -- if you have a search warrant for drugs and it

Page 48

1   includes all the stuff, you know, the drug money,
2   paraphernalia, all that stuff that they all include,
3   and you find $10 sitting on a table, 30 bucks sitting
4   on a table, or you find some dimes and quarters on the
5   floor, are you telling me that you're going to seize
6   all that and then turn it over and let the judicial
7   process system do with it what it may do?
8  A.  That's not what I'm telling you.  I'm telling you what
9   was seized in this particular location was what was on
10   this search warrant.  All monies as listed on this
11   search warrant.  This is a court order from a judge.
12  Q.  I understand that.
13  A.  So any money that can be deemed -- and there's ways to do
14   that.
15  Q.  Okay.  How do you do that?  That's my question.  So
16   you're going in a house and the search warrant says if
17   you find money that's used in a narcotics deal or
18   associated with narcotics, you can seize it, turn it
19   over to the judge, whatever you do.  I get all that.
20   My question to you is -- you just said you've done it
21   and seized money -- how do you determine that a $5 bill
22   or a $10 bill laying on a coffee table in somebody's
23   house is drug money such that you initially seize it?
24  A.  You said that we would seize $5 from a coffee table.  I
25   never said that we seized $5 from a coffee table.

Christianna Bullock v.     William Morrison     William Morrison - Vol. I
City of Detroit, Joseph Castro, William Morrison            April 18, 2018

Page 49

1 Q. Okay.  So how much do you take?
2 A. I can give you an instance of when I would seize $5 on
3    the coffee table.
4 Q. Okay.  Go ahead.
5 A. If there's dope sitting next to it.  That would be
6    seized.
7 Q. Okay.  All right.
8 A. Outside of that, we would never seize a $5 from a
9    table.
10 Q. Okay.  What if you had a dining room table with a
11    computer on it and there's five $100 bills laying on
12    that computer?  Would you seize that?  And there's no
13    drugs around it, and there's actually no drugs found in
14    the house.  Would you seize that five -- those five
15    $100 bills?
16 A. Depending on this investigation and how detailed this
17    investigation is, your knowledge, your prior knowledge
18    of this person's activity and involvement with the
19    narcotics game, then yes, it could be seized, or it
20    might not be seized.  That's a case-by-case basis.
21 Q. Who the officer in charge would make the determination?
22 A. Well --
23 Q. Who would do that?
24 A. Officer in charge.  Do you mean Sergeant Harris, or do
25    you mean the person whose investigation this is?

Page 50

1 Q. Either one.
2 A. I guess that would be either of their calls, but more
3    than likely that would fall on the person who's doing
4    the investigation.
5 Q. Would you make a note of it?  So let's say, for
6    example, in my hypothetical, that you go to a coffee
7    table in a house that you have a search for and there's
8    a computer on the coffee table in the dining room and
9    there's five $100 bills by that computer on that
10    computer.  Let's say a decision is made, well, we're
11    not going to seize it, okay?  Would that, nonetheless,
12    be noted somehow?  Because maybe you're thinking, well,
13    you know, maybe it's drug money, but we don't know.
14    Would you note it somehow?
15 A. Would we note that we didn't seize it?
16 Q. Would you note that you didn't see it or at least that
17    you saw it?
18 A. No, that we didn't seize it is what I said.  Would we
19    note that we didn't seize this money?
20 Q. Yes.  Yep.
21 A. If there was $500 sitting on a table?
22 Q. Yeah.
23 A. I mean that --
24 Q. I'm just asking what you might do.
25 A. Listen, we can talk about what experience has led you

Page 51

1    to do, and I would say this:  If there's a large sum of
2    currency that we're not going to seize at a house, we'd
3    either notate it on our report, had that documented
4    somehow on body camera, but if there's not a humongous
5    sum of money -- and that's just to avoid any accusation
6    of us taking the money.  It has nothing to do with this
7    narcotics investigation, it's just the --
8 Q. CYA.
9 A. That's -- exactly.
10 Q. Okay.
11 A. A lot of people have no recourse outside of getting
12    their house raided than to make a complaint or to sue
13    us.
14 Q. Sure.
15 A. And that's what they do.
16 Q. And so, in your opinion, what's a large sum -- amount
17    of money that you'd at least want to note it someway,
18    somehow?  200 bucks?
19 A. In terms of what we find in these dope houses, $200 is
20    not a large amount of money to me.
21 Q. Okay.  Now, you kind of pointed your finger at the
22    police report when you referenced dope house.  Are you
23    saying that this address, 17141, is noted dope house?
24    How many raids are you aware that's ever been done on
25    that address in your career?  How many?

Page 52

1 A. I'm not sure.  I'm aware that there was a --
2 Q. The one you were there on.  We know that.
3 A. -- narcotics buy made from this house.
4 Q. Okay.  How many times has that house been raided?
5 A. I can't tell you that offhand.
6 Q. How many times has there an alleged buy been done at
7    that address?
8 A. I can't tell you that offhand.
9 Q. So you classify that as a quote dope house that you
10    like to refer this to?
11 A. I mean if you go to a house and purchase drugs from it,
12    that's pretty much textbook what a drug house would be.
13 Q. All right.  Just asking what -- about the terminology.
14    So how were you dressed on this day?  I'm
15    assuming you don't have your dress blues on.
16 A. No.  We wear like a modified and tactical uniform.
17 Q. And describe to me on this day what you wore.  Or if
18    you can't tell me that day -- which I'm sure you're
19    going to tell me this was three years, you can't --
20    tell me generally what you would wear to a raid of this
21    nature.
22 A. Well, being that it's September, I'm not sure what the
23    climate dictated that particular day or what the
24    weather was.
25 Q. Well, give me all the possibilities then.

Christianna Bullock v.             **William Morrison**             **William Morrison - Vol. I**
City of Detroit, Joseph Castro, William Morrison                              **April 18, 2018**

Page 53

1  A.  It's a little bit cooler outside.  I don't know if
2      you're familiar -- if you've ever been in the military
3      or you know anything about the military, what a battle
4      dress uniform looks like or BU uniform.
5  Q.  So pants with pockets down the side.  Kind of a cargo
6      pant material, correct?
7  A.  Right.  Kind of a ripstop material, something of that
8      sort.
9  Q.  Color?
10  A.  Some of us wear navy blue, some of us wear black.
11  Q.  Okay.  So you've got blue or black cargo pants.
12  A.  Correct.  I could have had a tee shirt on that day.  I
13      could have had a Polo shirt on that day.  I could have
14      had a long-sleeved BU shirt on that day.
15  Q.  Got a bulletproof vest on?
16  A.  I've got a smaller bulletproof vest that goes
17      underneath my shirt, and then I have a larger vest,
18      which stops higher caliber rounds and goes over top of
19      that.
20  Q.  Do you have any type of lanyards on?
21  A.  A helmet, long gun.
22  Q.  What type of helmet do you got?
23  A.  Ballistic helmet.
24  Q.  Made out of that -- what is that Kevlon or Kevlar?
25  A.  It's made out of Kevlar.

Page 54

1  Q.  Yeah.  Wearing a mask?
2  A.  I don't generally wear a mask very often.
3  Q.  For the record, you're a light-skinned African American
4      male; is that correct?
5  A.  Sure.
6  Q.  Okay.  Did you have a beard and mustache on this day?
7  A.  I can't tell you.
8  Q.  Do you typically wear a beard and mustache?
9  A.  Change it all the time.  I do undercover work.
10  Q.  All right.  Any glasses?
11  A.  Sometimes I wear protective glasses, sometimes I don't.
12  Q.  Okay.  Don't remember if you had a mask on this day?
13  A.  I generally don't wear -- I wouldn't have worn a mask
14      for this day; probably not.
15  Q.  What about a lanyard or identification that you're an
16      officer?
17  A.  We have humongous patches across our vest that notate
18      police on the front, back; we have police patches on
19      our sleeves that could be visible while you're wearing
20      that over vest.
21  Q.  Any guns that you have, typically carry?
22  A.  Yes.
23  Q.  What is that?  What do typically carry?  Well, let's
24      start with do you remember what you carried this day?
25  A.  Referring to this report, I had a shotgun that day.

Page 55

1  Q.  And what type of shotgun?
2  A.  This particular day, I had a Remington 870 shotgun.
3  Q.  And I'm not much of a gun expert, so you're going to
4      have to help educate me on that.
5  A.  Okay.
6  Q.  So I'm assuming shotgun -- is it a single barrel or
7      double?
8  A.  Single.
9  Q.  Okay.  And you've got to manually load a plastic shell
10      into it, right?
11  A.  Correct.
12  Q.  Okay.  And that shell is -- has metal balls in it,
13      right?  Some people call it buckshot.
14  A.  Some people carry buckshot, some people carry slugs.
15  Q.  What do you -- what did you carry on this day?
16  A.  I think that day I had buckshots.
17  Q.  And how many buckshot is usually in one of the shells?
18  A.  When I carry a shotgun, I typically load it with double
19      ought buck, which is zero-zero buckshot, and then it
20      has nine .32-caliber pellets in it.
21  Q.  What color are those pellets?  Silver?
22  A.  Sometimes they're -- they have a silver tone to them,
23      sometimes they have a gold tone to them.
24  Q.  Okay.  So in layman's terms, there's nine little metal
25      balls in that --

Page 56

1  A.  Correct.
2  Q.  -- that shell.
3  A.  Sometimes nine, sometimes eight in double ought buck,
4      depending on the manufacturer.
5  Q.  All right.  But we're not talking something like a
6      hundred when you go goose hunting.
7  A.  Correct.
8  Q.  All right.
9  A.  That would be birdshot.
10  Q.  See?  There you go?
11      MR. MULLER: No. 6 shot.
12  Q.  (By Mr. Cabot):  So how long is that Remington 870?
13      How long is the barrel?
14  A.  That particular gun has a -- I believe that -- you've
15      got to excuse me because we carry a couple different
16      guns.
17  Q.  That's okay.  I mean, I'm just trying to get a general
18      sense of how big this thing is.
19  A.  It's a short-barrel shotgun, so I think the barrel is
20      14 inches.  We have the option to carry a couple
21      different guns, and I do carry a couple different ones.
22      I think that one has a 14-inch barrel.
23  Q.  During this pre-raid briefing, is one of the subjects
24      that's discussed is who's going to do what and who's
25      going to go where?

Christianna Bullock v.                    William Morrison           William Morrison - Vol. I
City of Detroit, Joseph Castro, William Morrison                                April 18, 2018

Page 57

1 A. The positions related to the raid are discussed, yes.
2 Q. You mentioned a number of people who were part of Team
3    Five.  Were they all part of the raid team on this
4    occasion?
5 A. Yes.
6 Q. Okay.  So why don't you help me through this.  What was
7    Mr. Harris's position going to be?  Like perimeter, or
8    was he going to be the first guy in?  The last guy?
9    Does he just sit in the car?
10 A. No.  He goes on entry.
11 Q. Okay.  Do you know, are you guys numbered as to who's
12    going to go first, second, third, and forth?  I know a
13    lot of times that's discussed.
14 A. It can be assessed, but that changes.  I mean, it
15    varies when you pull up to the house.
16 Q. Okay.  So your understanding is Harris generally was
17    going to be entry?
18 A. Yes.
19 Q. What about Wawrzyniak?
20 A. Wawrzyniak was assigned to one of the -- and I don't
21    remember this day exactly, but typically he was the
22    person who operated the Halligan tool, which is one of
23    the tools used to breach a doorway.
24 Q. So basically, he's the first guy, busts the door open,
25    and then he steps aside.

Page 58

1 A. No.
2 Q. No?
3 A. No.  A Halligan -- and that's the general position that
4    he used to do -- a Halligan is a fireman's tool.  It's
5    a pry bar essentially that's used to open the security
6    grates that you would potentially -- that you usually
7    find on houses in the city.
8 Q. Right.
9 A. So the bars, they go to the doors.  That tool's
10    inserted and the ram person sets that tool.  By sets, I
11    mean strikes it with the ram, and puts it inside of
12    there.  That way, he can get leverage to yank the front
13    grate open.
14 Q. Right.  But once the gate's open, he doesn't enter.
15    The other officers enter first, right?
16 A. He would --
17         MR. MULLER: No.  You've got to ram the door.
18         THE WITNESS: You've got to ram the door.
19 Q. (By Mr. Cabot): I understand.
20 A. Usually, unless the door's open.
21 Q. Right.  But the Halligan guy, he's not going to be one
22    of the first to enter once that door's open, is he?
23    Generally.
24 A. I've seen it, I mean, but generally, no.
25 Q. All right.  So Wawrzyniak was going to be the Halligan.

Page 59

1    What's Castro's position?
2 A. Castro's on the entry team, as well.  I'm not sure
3    exactly what his role was.
4 Q. What about Gaines?
5 A. Gaines, around that time, was probably ramming.
6         MR. MULLER: Ram.
7         MR. CABOT: You know, Mr. Muller --
8         MR. MULLER: I can't help it.
9         MR. CABOT: You may know the answer.  Whether
10    it's correct or not, none of us know, but I'm asking
11    your client, and I'm sure you prepped your client well
12    enough.  If he doesn't know the answer to my
13    question --
14         MR. MULLER: He's going to say, "I don't
15    know."
16         MR. CABOT: -- he can tell me then.  Oh,
17    that's a great answer.
18 Q. (By Mr. Cabot):  So directing my question only to the
19    deponent here, do you remember what Mr. Gaines'
20    position was?
21 A. Again, I don't remember what anybody's position was
22    except for mine, but I know around that time, officer
23    Gaines oftentimes was the ram position.
24 Q. Okay.  What about Tanguay?
25 A. Tanguay could've been on entry, more than likely, too.

Page 60

1 Q. Okay.  And Paul?
2 A. Paul goes on entry.  Sometimes he goes on perimeter
3    security back then.
4 Q. Okay.  What about yourself?
5 A. I was the point position.
6 Q. What does that mean?
7 A. I'm going to be the first person through the door.
8 Q. Is that your normal position?
9 A. Yes.
10 Q. Is that a position you like?  Is that why you normally
11    get it, or how does it usually fall on your shoulders?
12 A. I guess I'm just good at it.
13 Q. Okay.  Good at shooting animals?
14 A. Just good at running point.  It has nothing to with
15    shooting animals.  A lot of people think that the --
16 Q. Oh, hold on.  I get to ask the questions.
17 A. All right.
18 Q. How many animals have you shot in your career?
19 A. Probably somewhere around 80 or 90.
20 Q. All dogs, or are we talking other animals, as well,
21    during a raid?
22 A. Dogs.
23 Q. Just wanted to make sure you didn't shoot cats or
24    chickens or something.
25 A. I've never shot a cat or a chicken, sir.

Christianna Bullock v.                    William Morrison              William Morrison -  Vol. I
City of Detroit, Joseph Castro, William Morrison                                    April 18, 2018

Page 61

1  Q.  All right.  Do you get any training on the shooting of
2       animals?
3  A.  Training of shooting of animals?
4  Q.  Yeah, when to assess if they're a danger or not.
5  A.  Yeah.
6  Q.  How often does that occur?
7  A.  We have a department policy that says when we can shoot
8       animals.
9  Q.  I'm not asking that.  I'm going to get to that, but my
10      question now is how often have you been trained about
11      that?
12 A.  Well, we're trained on our department policy, so that
13      would be considered training.
14 Q.  How many times have you been trained on your department
15      policy?
16 A.  I mean, I --
17 Q.  Specifically on shooting of animals.
18 A.  I don't know.  I've seen it numerous times in our
19      department policy.
20 Q.  How many times have you been trained on it?  It's a
21      simple question.  How many times have you attended a
22      class?
23 A.  And the simple answer was I don't know.  It happens
24      numerous times.
25 Q.  All right.  How many times?

Page 62

1  A.  Numerous.
2  Q.  More than five?
3  A.  I go to training every year, in-service training for a
4       week every year, so at least 17 times.
5  Q.  Seventy times you've been trained on when to shoot
6       animals?
7  A.  At least.
8  Q.  Okay.  And you said you had a policy in place?
9  A.  Correct.
10 Q.  And there's a policy in place on this date regarding
11      shooting of animals, right?
12 A.  That's correct.
13 Q.  Okay.  So when I request that, I'll get that, right?
14 A.  You should be able to get that pretty easily.
15 Q.  All right.  So tell me when are you authorized to shoot
16      an animal and what -- are there any things you're
17      supposed to try before you shoot an animal?  Tell me
18      about your training and your -- the policy on that.
19 A.  So you want to know the policy?  The department policy
20      lists that if an animal creates an imminent threat
21      towards yourself or another citizen, another officer,
22      and if there's no bystanders in jeopardy, you can
23      discharge a firearm to stop the threat of the animal.
24 Q.  And is imminent threat defined, or does it leave it up
25      100 percent to the officer's discretion?

Page 63

1  A.  I don't know what the wording is exactly in the
2       department policy, but it mentions imminent threat.
3  Q.  Is a dog running in your direction imminent threat if
4       they're not barking?
5  A.  A dog charging your direction if they're not barking
6       could be an imminent threat.  It depends on the
7       individual situation.  My dog charges me.  I know my
8       dog's not going to bite me, but it's my dog.
9  Q.  What kind of dog do you got?
10 A.  German Shepherd.
11 Q.  Oh, okay.  Is it a -- used in police work, or is it
12      just your family pet?
13 A.  No.  Just a personal dog.
14 Q.  How long have you had it?
15 A.  He's two.
16 Q.  Oh, okay.  Have you always had dogs?
17 A.  Yes.
18 Q.  What kind of dogs have you had?  I had beagles in the
19      past.
20 A.  Doberman, Weimaraner.
21 Q.  Ever have a pitbull?
22 A.  No.
23 Q.  Okay.  Is your -- did you buy your Shepherd from
24      anybody, or get it from a shelter, or...
25 A.  Purchased him.

Page 64

1  Q.  Okay.  Do you have papers on him?
2  A.  Yes.
3  Q.  Is it registered with the AKC?
4  A.  Sure.
5  Q.  You don't have to agree with me.  Is it?
6  A.  Yes.  It's an AKC registered dog, yes.
7  Q.  All right.  I always had AKC registered beagles.  Great
8       rabbit hunters.  But boy, they like to run.
9  A.  They're hyper.
10 Q.  So prior to going up to the house and executing a
11      search warrant, you don't recall if you were told if
12      there was animals in the house, correct?
13 A.  Don't recall.
14 Q.  Before you go up to the house, do you kind of take a
15      general survey of the exterior of the property to see
16      if you can kind of get a general sense if there might
17      be a dog in the house?  For example, you look -- your
18      kind of looking at coming up to the house and you're
19      looking to see if there's a dog house or maybe some
20      water bowls or food dishes.  I mean, do you do that
21      typically to try to get a sense?
22 A.  I do.
23 Q.  Okay.  Do you recall if you saw any external evidence
24      of a dog that might be present?
25 A.  Don't recall, but I don't believe so.

Christianna Bullock v.                          **William Morrison**                    William Morrison – Vol. I
City of Detroit, Joseph Castro, William Morrison                                                    April 18, 2018

Page 65

1  Q.  Okay.  Did you hear the animal at any time prior to
2       shooting it?
3  A.  Don't recall if going up to that location we heard the
4       animal or not.
5  Q.  Okay.  Were you -- do you remember if you were told
6       anything specific about the address, whether it was
7       believed there would be people there or if they had
8       left or anything like that?
9  A.  Don't recall that.
10 Q.  Okay.  Do you recall generally who was believed to have
11      lived in the location, whether it's one person, a
12      family, five families?
13 A.  Don't recall that.
14 Q.  Okay.  Now, when you do a search warrant on a
15      particular address, do you ever go to the Register of
16      Deeds to find out who the owner is and things like
17      that?
18 A.  Yes.
19 Q.  Okay.  Is that kind of normal for you to do?
20 A.  Depending on the scope of that investigation.  Like I
21      said, there's smaller-level drug dealers and there's
22      larger-level drug dealers.
23 Q.  So you said this was a lower-level drug type situation?
24 A.  From my understanding, yes.
25 Q.  Right.  In your opinion, if this was -- landed on your

Page 66

1       desk to deal with, would you have done the Register of
2       Deeds search to see who does the house?
3  A.  No.
4  Q.  Who owns the house.
5  A.  No.
6  Q.  Okay.  Was there any type of preliminary announcement
7       done before entry was made?
8  A.  Yes.
9  Q.  Okay.  Tell me how that goes.  So what, you all just
10      start going up on the porch and getting on your
11      position?
12 A.  There's -- upon approach at that location, and then
13      again on the porch, it would continue we're announcing
14      our presence and purpose.
15 Q.  Okay.  And I imagine you're probably saying that pretty
16      loud, aren't you?
17 A.  Yes.
18 Q.  Okay.  Because you're -- because I'm assuming the
19      windows are shut to the house.  Do you know?
20 A.  I don't recall if they were shut or open.
21 Q.  Presumably the front door was shut, right?
22 A.  Front door was shut.
23 Q.  Okay.  Wooden -- big wooden door?
24 A.  I can't remember the material of the door.
25 Q.  But irrespective of that, you want to make sure that

Page 67

1       you say it with enough force and loudness that anybody
2       in the house would hear you, correct?
3  A.  Yes.
4  Q.  And that's for -- you know, that's the law, and No. 2,
5       to protect you, too, right?
6  A.  Yes.
7  Q.  Okay.  And did you make an announcement, or is that
8       somebody else's duty on this occasion?
9  A.  Oftentimes it's time by multiple people.
10 Q.  Okay.  So a lot of people yelling, "Police.  Search
11      warrant," right?
12 A.  I don't remember this particular day who yelled it, but
13      it was done.
14 Q.  Okay.
15 A.  It's done every time.
16 Q.  And your understanding is -- or at least your belief is
17      that using past practice as a guide, it was probably
18      more than one person who yelled it, right?
19 A.  It's possible.
20 Q.  And at any time, did you here a dog bark?
21 A.  No.  I don't recall.
22 Q.  Okay.  So you're approaching the house.  At least one
23      person, probably multiple people, announcing your
24      presence, search warrant, police.
25              And oh, by the way, I forgot to ask you this.

Page 68

1       You mentioned this and I forgot to follow up on it
2       earlier.  Did many of you have body cams on that day?
3  A.  When was it?  No, not back then.
4  Q.  Okay.  Any of you have video in the -- how did you all
5       get there?  Raid vans?  Squad cars?  Unmarked cars?
6  A.  We would have had a raid van and a marked scout car.
7  Q.  Let me ask you about the marked scout car.  Would that
8       have been manned by somebody who was not part of the
9       raid team, but from the neighboring precinct?  Because
10      other cases, there's a marked scout car and they call
11      in somebody from the precinct just to sit out there.
12 A.  We don't generally do that.  I mean, it's been done
13      before, but oftentimes it's somebody from our own team.
14 Q.  Okay.  Who was in the marked scout car in this case?
15 A.  According to this report, it more than likely would
16      have been Ryan Paul.
17 Q.  Okay.  And does that mean they generally stay in that
18      car, or is that just how -- their mode of arrival?
19 A.  No.  It's our policy that we have to take a marked
20      vehicle with us on a raid.  That car would have been in
21      front of the location or somewhere near that area.
22 Q.  And is that a fully marked --
23 A.  Yes.
24 Q.  -- like lights, exterior lights?
25 A.  Yes.

Christianna Bullock v.
City of Detroit, Joseph Castro, William Morrison

William Morrison

William Morrison - Vol. I
April 18, 2018

Page 69

1 Q. All the symbols on the side and all the light bars and
2     the big bumper that says "Detroit Police," all that
3     stuff?
4 A. Yes.
5 Q. All right. The raid van, is that marked or unmarked or
6     semi marked?
7 A. What van did we have then? It's an unmarked van. It
8     has lights in it. So I mean, some people's --
9 Q. Inside lights though, right?
10 A. Yeah.
11 Q. Like in the window?
12 A. Some people's determination of semi marked is the
13     lights.
14 Q. Okay. But the lights are not -- they're interior,
15     right?
16 A. Right. It doesn't have any decals, doesn't have a
17     light bar.
18 Q. Okay. So you all are approaching the house; at least
19     one person that's announcing. We get up to the porch.
20     What happens next?
21 A. Well, presence and purpose is announced.
22 Q. Okay.
23 A. When we get no response from house, entry was forced
24     through the front door.
25 Q. And who did that?

Page 70

1 A. Well, it says here that entry -- forced entry was made
2     through the security grated entry door, so officer
3     Wawrzyniak was the Halligan assisted by officer Gaines,
4     who had the ram. That grate was popped open and the
5     ram person used the ram to force the entry door.
6 Q. Okay. Basically -- and the ram has a big end on it,
7     right?
8 A. Yes.
9 Q. And you kind of push it against the door; makes it
10     open, right?
11 A. Yes.
12 Q. Did it leave a dent in the door?
13 A. Generally does.
14 Q. All right. But based -- do you know if it breaks the
15     frame of the door?
16 A. I can't remember.
17 Q. Okay. So needless to say, that would have been done by
18     who again? You think.
19 A. The ram person was officer Gaines.
20 Q. And then who -- you're the first to enter?
21 A. Correct.
22 Q. Your shotgun's fully drawn?
23 A. Yes.
24 Q. Ready to shoot position or low-ready position?
25 A. No. It's not low-ready.

Page 71

1 Q. But ready to go, isn't it?
2 A. Yes.
3 Q. Okay. So stock at your shoulder, barrel ready, hand by
4     the trigger raring to go if you have to, right?
5 A. I don't know if -- those are terms you're using.
6 Q. Well, I'll make it real simple. Your hand was
7     positioned by that trigger so if you had to make a
8     split-second shot, you'd be able to do it, right?
9 A. Sure.
10 Q. Okay. Now, there has to be what, a second or two by
11     the time the gate's broken and this door is busted down
12     before you enter, right? Because they've got -- the
13     grate's got to be broken open, the door's got to be
14     broken open, they've got to step aside for you to be
15     the first to enter, right?
16 A. I mean, there's several seconds involved in that.
17 Q. Okay.
18 A. They don't necessarily have to step inside. I'm
19     positioning myself around them. I work around them.
20 Q. Okay. So at any time during the breaking the gate,
21     busting the door open, do you hear a dog bark?
22 A. No, I don't, but that's --
23 Q. That's just my question. If you want to add some more,
24     you can talk to your attorney and he can question you
25     and ask all the questions he wants, but I go really

Page 72

1     step-by-step methodically, okay?
2 A. Okay.
3 Q. The door's open, your gun's in the ready-to-shoot
4     position. Do you cross the threshold of the door
5     before you shoot?
6 A. No.
7 Q. So you're still on the outside of that threshold; is
8     that correct?
9 A. Standing on the front porch, correct.
10 Q. Okay. How many steps from the threshold are you?
11 A. Right there in the doorway.
12 Q. Okay. So if you took one step, your -- at least one
13     foot would be over that threshold of the door, correct?
14 A. Probably.
15 Q. All right. What's the first thing you see?
16 A. A dog.
17 Q. Okay. Where is this dog when you first see it?
18 A. In the living room.
19 Q. Before we get much further into that, tell me generally
20     the layout as you -- when you open that door, there's a
21     hallway in front of you, I presume.
22 A. I think in that particular house, there was a small --
23     very small, like, front vestibule area where there was
24     a closet off of it. From there --
25 Q. So the area where you put your shoes and coat?

Page 73

1 A. Sure.
2 Q. Okay.
3 A. From there, the house opens up into a living room.
4 Straight ahead, and straight ahead from my vantage
5 point from the porch, there's a hallway that leads
6 to -- and consistent with these style houses in the
7 city -- a couple bedrooms and a bathroom. Off of the
8 living room to my left, so when you first enter the
9 location, if you look to your left, that would be the
10 kitchen. Off of the kitchen, is the stairwell into the
11 basement.
12 Q. Yep. So you see this dog in the living room. What's
13 the dog doing when you first to see it?
14 A. The dog is looking at us or looking in our direction,
15 barked.
16 Q. How many times did it bark?
17 A. Don't recall.
18 Q. Is it standing in one position?
19 A. It looked at us and kind of let out a bark, and then I
20 guess when it determined -- I can't tell you what the
21 dog was thinking because it's a dog. That would be
22 speculation. But the dog, at that point in time --
23 Q. Unless you're a dog whisperer.
24 A. -- the dog must have realized that it wasn't anybody
25 that it knew and charged our direction.

Page 74

1 Q. And when you say charged, describe to me what the dog
2 did. Are you talking full on sprint with every muscle
3 it could to come after you guys?
4 A. Yes. It came charging towards the front door.
5 Q. How far away was it when it first started to come at
6 you?
7 A. When I first saw the dog, I'd say maybe 12 -- the dog
8 was in the living room, so not far away from the door.
9 Q. About 12 feet?
10 A. Twelve to 15 feet, maybe.
11 Q. Okay. How many times did it bark?
12 A. I don't remember how many times it barked. I just
13 remember it barking and then it looked at us, saw the
14 door being forced open, I guess, looked in our
15 direction, barked, and then started charging.
16 Q. Do you think most dogs would do that?
17 A. A lot of dogs would do that.
18 Q. Do you think your German Shepherd would do that?
19 A. I guarantee you'd have to shoot my German Shepherd if
20 he came to my front door.
21 Q. And your German Shepherd doesn't have any pitbull in
22 it, does it?
23 A. No.
24 Q. All right. Do you know what kind of dog this was?
25 A. It looked like a pitbull to me.

Page 75

1 Q. Did you ever have anyone analyze the dog or anything to
2 know exactly what it might have been?
3 A. It looked like a pitbull to me.
4 Q. And why did it look like a pitbull?
5 A. Because it looked like a pitbull. I mean certain
6 breeds of dogs have a particular --
7 Q. Okay. Tell me what that is to you. I mean, I could
8 ask 15 people on the street --
9 A. Okay. Well --
10 Q. -- to describe why they think a dog's a pitbull and
11 I'll get 15 different answers. So I'm asking you, what
12 about the dog made you think it was?
13 A. Okay. Well, just like we talked about your beagle
14 earlier, I know what a beagle looks like. We talked
15 about my German Shepherd. I know what a German
16 Shepherd looks like. We talked about a pitbull. I
17 know what a pitbull looks like. I just happen to know
18 what different breeds of dogs look like.
19 Q. Okay. So are you telling me this was a full-bred
20 pitbull, or was it something with a mix in it, or you
21 don't know?
22 A. I don't know the percentage of pitbull. It looked like
23 a pitbull to me.
24 Q. Okay. Just because it looked like a pitbull. Was it
25 something about the snout, something about the tail,

Page 76

1 something about the leg muscles, something about the
2 jaw?
3 A. All of that looked like a pitbull to me.
4 Q. All right. Did you ever try to give it any type of
5 verbal command, like get back?
6 A. No.
7 Q. Did you ever retreat even a step or try to shut the
8 door?
9 A. Can't retreat at that point in time. There's no door
10 to shut. The door was forced open. I have people
11 standing behind me who were standing on the porch.
12 Q. Is the door of its hinges?
13 A. Don't remember.
14 Q. If the it's on its hinges, you can close the door,
15 right?
16 A. So I'm going to take my hands off of a gun --
17 Q. I'm just -- you don't get to ask the questions today.
18 I do.
19 A. Technically that would not be wise to do.
20 Q. Okay. How many times did you shoot the dog?
21 A. That initial time I fired two rounds at the dog.
22 Q. So you had -- so you have to load each bullet in,
23 right? Or how does your gun work?
24 A. This gun has a magazine capacity of five rounds.
25 Q. Okay. With one in the barrel, or...

Christianna Bullock v.                          William Morrison                    William Morrison – Vol. I
City of Detroit, Joseph Castro, William Morrison                                              April 18, 2018

Page 77

1 A.   One's in the chamber.
2 Q.   Okay.  So one's in the chamber.  You've got five in
3      the -- I'm going to call it a magazine or clip, but
4      five in the magazine or clip?
5 A.   Sure.  Yes.
6 Q.   Okay.  Is it semi automatic?  Fully automatic?  Or
7      you've got to pump it each time?
8 A.   This particular gun, a Remington 870, is a pump-action
9      shotgun.
10 Q.  All right.  So describe to me what you do.  So you pull
11     the trigger.  You shoot it once.  Then what do you do
12     to get the next bullet ready to go and shoot it?
13 A.  You rack that round, spent casing out.
14 Q.  You've got to be real simple for me.  What -- so you
15     pull the trigger, one bullet comes out.  Buckshot goes
16     out.
17 A.  When you pull the trigger on that pump-action shotgun,
18     that round fires.  The spent casing stays inside the
19     chamber.  You have to rack the gun to eject that spent
20     casing.  Upon ejecting that spent casing, the gun also
21     chambers another round from the magazine, too.
22 Q.  Okay.  And then at which time you can pull the trigger
23     again right away and shoot that --
24 A.  Yes.
25 Q.  -- bullet until your magazine's empty.

Page 78

1 A.   You'd have to rack it after each time.
2 Q.   Right.  But racking it means you flip a lever or --
3 A.   No.
4 Q.   Is that a lever on the side?
5 A.   It's a pump-action shotgun.  You pump it.
6 Q.   Oh, okay.  See I told you.  You've got to describe this
7      to me.  I don't -- you know.
8            So you pull a thing on the barrel towards
9      you.  It shoots the spent casing out.  The next bullet
10     comes up, and he can squeeze the trigger.
11 A.  There's a handle that covers the magazine, too, that's
12     on a slide.  That has to be pulled backwards to eject
13     that round or chamber a round.  It does both.
14 Q.  So how many -- how fast can you fire these bullets out
15     of this gun?  I mean, you sound like you're pretty
16     good.  So if you wanted to -- is it like a -- can you
17     do a bullet a second, or are we talking a bullet every
18     two seconds or three seconds?
19 A.  I've never timed myself doing it before, but I can do
20     it pretty quickly.
21 Q.  So do you think about a bullet a second?
22 A.  Probably.
23 Q.  You come pump it, get the next one out, up and shoot
24     it?
25 A.  Probably faster than that, yes.

Page 79

1 Q.   Okay.  What response did the dog haver after the first
2      bullet such that you needed to do a second?  Or didn't
3      you care, you just did two out of -- just out of habit?
4 A.   So it's not a habit.  I just fired two rounds at that
5      particular time.
6 Q.   Okay.
7 A.   You've got to understand this dog's momentum is
8      carrying it forward, so I fired two rounds to get that
9      dog to stop coming in our direction.  The dog's
10     creating an imminent threat at that time.  I stopped
11     firing when the dog retreated.
12 Q.  Did it show its teeth?
13 A.  Did it show its teeth?
14 Q.  Yeah.
15 A.  Yeah, as it was -- it barked, and as its running
16     towards us, it's snarling and charging in my direction.
17 Q.  Showing its teeth and barking at the same time.
18 A.  It barked first, then it charged.  As it's charging, I
19     can see its teeth.
20 Q.  Did it growl?
21 A.  Barked, growled, it made some noise.
22 Q.  So you don't know if one bullet would have been
23     sufficient because you just automatically shot two,
24     correct?
25 A.  I don't know.

Page 80

1 Q.   Right.  You didn't give the animal a chance to react to
2      the first bullet.  You did two right away, right?
3 A.   That's not how things work.
4 Q.   I'm just asking in this case.  You did --
5 A.   I fired two rounds.  That's what's -- that's what
6      happened in this case.  I fired two rounds at the dog.
7 Q.   Okay.  You didn't do one, see if there was a response.
8      You automatically did two?
9 A.   I fired two.  Two.
10 Q.  And your goal is shoot to kill?
11 A.  My goal is to stop that dog from charging me.
12 Q.  Okay.  So where'd you aim?  Where on the dog did you
13     aim?  The heart?  The face?  A leg?
14 A.  I aimed in the direction of the dog.  I can't tell you
15     exactly were I aimed.  This isn't a precision shot that
16     I'm taking.  This is a pretty bang-bang scenario here.
17     The door comes open, dog barks, again it's charging.
18     It's that fast.  So I fired two shots from the gun.
19 Q.  What response after the second shot did the dog have?
20 A.  The dog ran into the kitchen and into the basement.
21 Q.  Was the dog bleeding?
22 A.  Yes.
23 Q.  Did the dog have any type of verbal response when you
24     shot it?  Like did it squeal or...
25 A.  Yes.

Christianna Bullock v.    William Morrison    William Morrison - Vol. I
City of Detroit, Joseph Castro, William Morrison          April 18, 2018

Page 81

1  Q.  Okay.
2  A.  That's what they do when you shoot them.  They squeal.
3  Q.  Okay.
4  A.  Because it's hurt.
5  Q.  And where did -- it went into the kitchen.  Did it
6  leave a blood trail?
7  A.  Yes.
8  Q.  Okay.  And what did you do next?  So you're still the
9  first one in there, right?  You're the only one in the
10  house still after the second shot?
11  A.  I wasn't in the house period when I fired the shot.  I
12  was still on the front porch.
13  Q.  You were just shy of the threshold?
14  A.  Correct.
15  Q.  So what happens next?  The dog goes to the kitchen.
16  A.  We made entry into the house.
17  Q.  Okay.  Everybody?
18  A.  Yes.
19  Q.  Everybody's behind you.  You're the first in?
20  A.  Correct.
21  Q.  Where did you go?  What'd you do?
22  A.  That particular house, the way that was set up, I
23  believe the first floor was secured.
24  Q.  How long did it take to secure the first floor?
25  A.  I'm not sure.

Page 82

1  Q.  Who secured it?
2  A.  Everybody.
3  Q.  Okay.  Does everybody stay on the first floor before
4  you go upstairs or downstairs, or do some people
5  immediately go, like, to the attic and then the
6  basement?  How does -- how did that work here?
7  A.  With the amount of people we had there, it would have
8  been 4x4.
9  Q.  Okay.  So everybody goes around the first floor and
10  secured.  Where's the dog at the -- while that first
11  floor is being secured?
12  A.  The dog was in the basement area.
13  Q.  Okay.  How long did it take to secure the first floor?
14  A.  Not sure.
15  Q.  Less than a minute?
16  A.  I don't know if it was less than a minute, but probably
17  around a minute.
18  Q.  Okay.  There was an attic to the home, right?  With
19  some stairs that went up to an attic area.  Do you
20  know?
21  A.  Yeah, I don't know if it was an attic or if this was a
22  room setup up there.  I can't recall exactly.
23  Q.  Did everybody go up there, or does --
24  A.  Everybody wouldn't go up there, but the majority of the
25  people go up there.  Somebody would probably stay on

Page 83

1  the first level.
2  Q.  Did you ever go to the attic?
3  A.  I can't recall.
4  Q.  Okay.  Do you know who did for certain?
5  A.  No.
6  Q.  Okay.  But your hypothesis would be somebody did, you
7  just don't know who or how many?
8  A.  Right.
9  Q.  So going back to the pre-raid briefing, we talked about
10  what you were looking for; looking for drugs.  Were you
11  looking for people, too?
12  A.  I mean, it's a house.  You typically encounter people
13  inside of a house.
14  Q.  Were you looking for anyone in particular as being
15  maybe a source of the drugs, or...
16  A.  There -- more than likely, the search warrant was a
17  described seller.
18  Q.  But you don't recall in this particular case?
19  A.  What I'm saying is it's more than likely.  I don't
20  recall on that particular warrant.
21  Q.  That's what I just said.
22    So after the first floor is secure, what do
23  you do?
24  A.  I don't recall if we went upstairs first or downstairs.
25  Q.  Okay.  But not everybody goes upstairs and downstairs.

Page 84

1  I mean, you just told me not everybody probably would
2  have gone upstairs.
3  A.  This -- if he were to go upstairs first, not everyone
4  would go upstairs because that would not be tactically
5  sound to do.  And I don't know what happened that
6  particular day, again because this was 2015, and again,
7  because I've raided over 3000 houses.  But knowing how
8  we do things tactically, that would not -- more than
9  likely wouldn't have been done.
10  Q.  On average, how many houses do you raid a year?  So
11  curiosity, from 2015 to today, how many houses do you
12  think you've raided; you personally been involved in?
13  A.  There's weeks -- there's days we raid three houses a
14  day.
15  Q.  Okay.
16  A.  A lot of times it's two; sometimes it's one.
17  Q.  So what do you do next that you recall in this
18  incident?
19  A.  I just remember going into the basement encountering
20  this dog again.
21  Q.  Do you hear anything coming from that dog when it's in
22  the basement?  Like is it barking?  Is it crying?  Is
23  it whimpering?
24  A.  At this time it stopped crying and started barking
25  again.

Christianna Bullock v.    William Morrison    William Morrison - Vol. I
City of Detroit, Joseph Castro, William Morrison        April 18, 2018

Page 85

1 Q. And it's in the basement?
2 A. Correct.
3 Q. Who goes into the basement other than you?
4 A. I don't know who was behind me at that particular time.
5 Q. Okay.  So I'm assuming you go from one area of the
6 house maybe down a step or two to a little landing and
7 then make a little turn and then there's more steps to
8 the basement.  Is that how this house looked?
9 A. Yes.
10 Q. Okay.  How far into the basement did you go before
11 something else happened?
12 A. I don't recall exactly if I was still on the steps or
13 completely in the basement, I just recall encountering
14 the dog again in the basement.
15 Q. And as you're at least approaching the steps, is the
16 dog barking or crying or doing nothing?
17 A. The dog initially cried.  Then it went to the basement
18 and barked.
19 Q. Okay.  When you went to the steps of the basement, do
20 you then see the dog?
21 A. Not initially, but then I recall the dog coming towards
22 the steps.
23 Q. Okay.  So at this point, you don't know if you're on
24 the steps or completely in the basement, but either
25 way, you started to make your way into the basement --

Page 87

1 A. That's not how that works tactically.  I can't tell
2 you -- I'm not looking to see who's exactly behind me.
3 One of my crew members, several of my crew members
4 would have been behind me, but I know tactically I'm
5 not going to walk down some basement stairs and check
6 back who's behind me.  That's not how that works.
7 Q. Okay.  Well, if you want to check any of the documents
8 here to see -- help refresh your memory, you can
9 certainly do that.  You've done it so far.
10 A. It's not going to --
11 Q. It doesn't say, does it?
12 A. It's nog going to be in there.  It would have been one
13 of these people that I discussed that was on entry with
14 me.  Probably several of them.
15 Q. So the dog limps towards you, and what do you do?
16 A. I don't know if it limped towards me, but it came
17 towards me.
18 Q. And what does it do?
19 A. It got shot again.
20 Q. And why did you shoot it?  Because it came at you?  Or
21 was it barking at you?  Was it --
22 A. This dog was again in the basement barking.  This dog
23 has already charged us, and this dog continued to
24 advance towards myself, my crew members that particular
25 time, still creating an imminent threat towards us, and

Page 86

1 A. Correct.
2 Q. -- and you see the dog approach.  Is that safe?
3 A. Yes.
4 Q. You can say that.  Is the dog charging?
5 A. This dog again was barking, and it came towards us
6 again.
7 Q. Did it walk towards you?  Limp towards you?  Run at you
8 full force?
9 A. It's kind of limping but coming towards us, though.
10 Q. Is it running?
11 A. I don't know if I'd -- from what I recall, it was
12 coming towards.  I don't know exactly how fast it was
13 going.
14 Q. But definitely limping?
15 A. It was injured.
16 Q. Okay.  Could you see it bleeding?
17 A. There was blood all like in the kitchen and leading
18 towards that direction.
19 Q. So you knew you got it?
20 A. It was hit.
21 Q. Okay.  And you said, "It was coming at us."  Who's the
22 us?
23 A. Well, I'm not going to be entering that basement by
24 myself, so that'd be --
25 Q. Well, that's why I asked who was with you.

Page 88

1 the dog was shot again.
2 Q. How many times?
3 A. Twice.
4 Q. Again pretty sequentially close in time; basically one
5 two?
6 A. Correct.
7 Q. Okay.  And again, you probably just aimed in its
8 general direction.  You didn't aim for a particular
9 body part, part of the body correct?  You just aimed
10 the barrel at the dog and shot it twice, right?
11 A. Correct.
12 Q. Okay.  What response, if any, did the dog have at that
13 point?
14 A. It died.
15 Q. Okay.  How do you know it died?  I mean obviously it
16 fell to the ground, I'm assuming, but how do you know
17 it died at that moment?
18 A. I mean, it was mortally wounded.
19 Q. Okay.  Then what happens?
20 A. Then we secured the basement.
21 Q. And again, you don't know who that was, other than you,
22 right?
23 A. It would have been myself and a collection of --
24 Q. Right.  But I'm saying you don't know who it was.  It's
25 you and other people.  You don't know who they were,

Case 2:17-cv-12685-DPH-APP   ECF No. 26-3, PageID.293   Filed 11/16/18   Page 25 of 29

Christianna Bullock v.                         William Morrison                    William Morrison - Vol. I
City of Detroit, Joseph Castro, William Morrison                                            April 18, 2018

Page 89

1    right?
2 A. It was these people that made entry into the house.
3 Q. The group?
4 A. Crew. There was a crew, right.
5 Q. Did the whole crew --
6 A. Assisted me in securing the basement.
7 Q. The whole crew came down?
8 A. I don't know if it was the whole crew, but it was
9    members of the crew.
10 Q. All right. And what did you do to secure the basement?
11    Did you just look around or what?
12 A. We checked the basement. We check closets, we checked
13    cabinets, we check vents, furnaces sometimes, anywhere
14    that a person could hide.
15 Q. Okay. Did you check furnace vents in this case?
16 A. I don't remember. That's typical of what would occur,
17    though, during a raid.
18 Q. Do you ever take vents off of ceilings?
19 A. What kind of a vent?
20 Q. Like air vent, either intake vents or --
21 A. If it's big enough for a person to hide in and we
22    thought a person was hiding in it, sure.
23 Q. All right. How long did it take you to secure the
24    basement?
25 A. Don't remember.

Page 90

1 Q. Did you dismantle anything or take anything apart, do
2    you recall? Or you don't remember?
3 A. Again, I don't recall that, but in this instance, a
4    house is -- this is a two-part type deal. You go into
5    the house and you secure it, searching for people.
6    Then you come and you do your search for contraband.
7 Q. Okay. And we're going to get to all that, but I just
8    want to try to see what it -- exactly you did and the
9    full extent that you did it when you did it.
10 A. This -- a house of this size, typically takes us a
11    couple minutes to secure.
12 Q. Okay.
13 A. And that -- nothing out of the ordinary presented
14    itself that day that I can remember that made it take
15    any longer.
16 Q. All right. So then after you secure the basement, what
17    happens? Where'd you go?
18 A. Again, I don't remember if we secured the basement
19    first and then the upstairs, or if we secured the
20    upstairs and then the basement. But after that, the
21    house was eventually declared secure. Then we came
22    back in and began a search for contraband.
23 Q. And do all of you engage in that process of searching
24    for contraband?
25 A. Some people search, some people maintain a presence for

Page 91

1    security to make sure nobody walks into the house while
2    we're doing our search, some people are doing
3    paperwork.
4 Q. Who searched, who did security, and who did the
5    paperwork?
6 A. I can't recall exactly.
7 Q. What you do of those three?
8 A. I remember searching -- from what I can recall from
9    this incident, I remember searching a little bit
10    outside in the driveway, which is to the left of the
11    house. I remember kind of watching the front of the
12    location, kind of like in a security capacity.
13 Q. Okay. Did you ever search a bedroom?
14 A. I don't recall.
15 Q. So you don't know if you did or didn't?
16 A. I don't recall. It's possible.
17 Q. Okay. Do you know specifically, as you sit here today,
18    anybody specifically what they searched or where they
19    searched in that house after the location was secured?
20 A. No, I don't.
21 Q. Okay. Who typically does -- is there people in your
22    team that typically will do the searching?
23 A. No. It's not like a set thing. Like one person will
24    be doing some preliminary paperwork and then other
25    people will get involved in the search. If there's

Page 92

1    some people that we have detained, one person may watch
2    them.
3 Q. Okay.
4 A. And as I said before, another person might maintain
5    situational security at the location.
6 Q. And I don't know if I asked you this. I might have,
7    but I'll ask it again. How many dogs have you shot and
8    killed in your career?
9       MR. MULLER: You already asked him that.
10       MR. CABOT: Oh, I forgot.
11       THE WITNESS: I don't know if I told you. I
12    said somewhere around 80 or 90, I think.
13 Q. (By Mr. Cabot): Okay. When you shot the dog in this
14    case, did you alert anyone to that fact? Do you have
15    to call animal control? Do you have to call 911
16    dispatch?
17 A. There's some notifications that have to be made, but
18    that's handled by the sergeant.
19 Q. So that would have been Harris that would have or
20    should have done that?
21 A. Yes.
22 Q. In this case.
23 A. Yes.
24 Q. Do you know if that was done?
25 A. Yes.

Christianna Bullock v.                          William Morrison                    William Morrison – Vol. I
City of Detroit, Joseph Castro, William Morrison                                              April 18, 2018

Page 93

1  Q.  Okay.  And how do you know that?
2  A.  Because it's done every single time.
3  Q.  Okay.  And is that notification a paper notice, or is
4      it done initially by a telephone call?
5  A.  He has to notify a couple different people.  He has to
6      notify the desk of the particular precinct that the
7      shooting occurred in.  He has to notify our
8      notification and control center, which is like our
9      communications center.  Depending on other variables,
10     he has other people he has to notify, too.  But he has
11     to make notifications via phone.
12 Q.  Okay.  What are you supposed to do with the dog?  Or
13     just leave it?
14 A.  Our policy is that our animal control will generally
15     come to the location if they're around, meaning if
16     they're working at that particular time they'll come to
17     the location, our animal control or our -- and by our
18     animal control, I mean the City of Detroit animal
19     control or Department of Public Works will come out to
20     remove the dog.  If neither of those entities can do
21     so, that dog is removed by us and then we take it down
22     to our animal control facility where it's turned over
23     to them.
24 Q.  Turned over to the what?
25 A.  To whoever is present at the animal control facility --

Page 94

1  Q.  All right.
2  A.  -- at that particular time after hours.
3  Q.  So who came -- who dealt with the dog in this case?
4  A.  I don't recall.  If I can look at this report to
5      refresh my recollection, it looks like animal control
6      and DPW were contacted.  They were unable to be
7      contacted, more than likely because it was after hours.
8      We loaded that particular dog into a scout car.
9  Q.  Who's the we?
10 A.  Crew.  It wasn't me.  Well, it could have been me.  I'm
11     not sure.
12 Q.  Do you have an independent recollection of you loading
13     it in the car?
14 A.  No.  When I said we, it was because this says crew.  So
15     members of the crew loaded the expired dog into the
16     scout car and transported it down to animal control.
17 Q.  To know what happened with it then?
18 A.  It's probably disposed of.
19 Q.  I'm just asking --
20 A.  I don't work for animal control.
21 Q.  I'm asking you if you know.
22 A.  No.
23 Q.  Okay.  So your answer's no, you don't know?
24 A.  I don't work for animal control, so I don't know what
25     they do with the dog after that.

Page 95

1  Q.  And again in this case, you don't know if you searched
2      the bedroom or anything like that?
3  A.  I could -- it's possible that I participated in the
4      search of the bedrooms, but I don't recall.
5  Q.  Do you remember there being any discussion of any type
6      of human remains in the house?  Like cremated remains
7      in a box or anything like that.
8  A.  No.
9  Q.  Let me ask you this:  You shot your weapon in this
10     house four times, correct?
11 A.  Correct.
12 Q.  Okay.  Twice when the dog's in this living room when
13     you first open -- when the door's first opened, then
14     twice in the basement, correct?
15 A.  Correct.
16 Q.  Did you ever hear anyone else fire a shot in that house
17     that day of any type, whether it's a gun, shotgun?  Do
18     you know?
19 A.  No.
20 Q.  Okay.  Do you know how there would be bullet holes in
21     the mattress in the bedroom of this house?
22 A.  No.
23 Q.  Did you ever shoot a gun into the bedroom of the house?
24 A.  I didn't fire a gun into the mattress of the bedroom.
25 Q.  Okay.  Did you ever shoot bullets into the bedroom

Page 96

1      door?
2  A.  No.  But, again, like was stated earlier, you asked how
3      many pellets are in this particular gun.  So those
4      pellets -- and this is theoretical because, again, I
5      didn't shoot a mattress.  I don't know if a mattress
6      was shot.  This is just what you're telling me.  I
7      didn't see any holes in a mattress.
8  Q.  All right.
9  A.  But theoretically, these rounds don't stop until they
10     hit something.  So if some of those pellets hit the
11     floor at a perpendicular angle, they could've
12     ricocheted off the floor and then hit a mattress in the
13     bedroom, which was off of the hallway that I described
14     that I saw when we opened up the door.
15 Q.  How far was that dog that you shot from the bedroom
16     door?
17 A.  The dog was in the living room.  The bedrooms were
18     situated at the -- into the hallway.
19 Q.  Other end of the house, right?
20 A.  It's maybe -- footage wise, maybe 25 feet away.
21 Q.  Do you have any idea what the spread, the bullet spread
22     is once the buckshot is fired?
23 A.  I do, but that changes once it hits something.
24 Q.  I understand.  What's the spread when it leaves the
25     barrel?  It's not a very wide spread, is it?

Christianna Bullock v.            **William Morrison**           **William Morrison - Vol. I**
City of Detroit, Joseph Castro, William Morrison                  **April 18, 2018**

Page 97

1     Generally.
2 A.  With buckshot, it is a little wider.
3 Q.  What about the shot used in this case?  What's the
4     general spread when it leaves the barrel?
5 A.  The shot pattern on that particular around at maybe --
6     it depends on what yardage you're talking about.
7 Q.  Well, I mean the dog, you said it was only about
8     12 feet away.
9 A.  You said when it left the barrel.  So when that leaves
10    the barrel, it's going to be approximately the size of
11    the cup or the wadding that holds the pellets together.
12    That's what leaves the barrel.  From there, it
13    continues to spread up until it's effective range of
14    that round -- has an effective range, because it's a
15    buckshot round, it's used for shooting bucks, deer,
16    the effective range of that round probably would be
17    around 50 yards maximum.
18 Q.  Okay.  But when you shot the dog, the dog was charging
19    you, you said.
20 A.  Correct.
21 Q.  But initially it was 12 feet away, approximately.
22 A.  Correct.
23 Q.  Which means it's lessening its distance by the second
24    time you shot it.  So it's closer to you the second
25    time, right?

Page 98

1 A.  No.  We talked about how I rapidly --
2 Q.  Yeah, but whether it's a half a second or a full
3    second, that dog's decreasing the distance between your
4    first shot and the second shot, right?  You've got to
5    agree with that, right?
6 A.  I don't agree with that because that's not how that
7    happens.
8 Q.  Well, the first time you shoot the dog, the dog just
9    stops?
10 A.  This isn't the movies.
11 Q.  I'm just asking.  Does the dog just stop the first time
12    you shoot it?
13 A.  No.  It's -- if something is traveling towards you,
14    it's going to remain in motion until something stops
15    it, right?  That's basic physics.
16 Q.  Yeah.  Right.
17 A.  So a dog doesn't just stop unless you hit it in the
18    central nervous system and it dies.  Human, dog, cow,
19    whatever animal you want.
20 Q.  You're right.  That's why I said after you shoot it the
21    first time, it still moves towards you, doesn't it?
22 A.  It's moving.  I don't know how much more ground it
23    gained at that particular time.  I fired two shots.
24    This is a simultaneous thing.  Boom, boom.
25 Q.  So the closer it gets to you, the less that bullet

Page 99

1    pattern is, right?  You'd agree -- you have to agree
2    with that.
3 A.  No.  Because it's -- I fired two shots.  It's this
4    fast:  Boom, click, boom.
5 Q.  All right.
6 A.  So I don't know how fast or how much the dog stopped,
7    how much it slowed its momentum between shot one and
8    two.  I fired two shots at the dog.  So it's still in
9    approximately the same area when both shots were fired
10    at it.
11 Q.  Did you uncover any weapons or things or contraband at
12    any time during this encounter?
13 A.  I didn't make any confiscations from this house.
14 Q.  Did you look at anything that was removed from the
15    home?
16 A.  There was a gun confiscated from there.
17 Q.  How many?
18 A.  I think one.
19 Q.  Do you know what kind?
20 A.  A revolver of some sort.
21 Q.  Did you actually look at it, or were you told that?
22 A.  No, there was a gun there.  I saw it.
23 Q.  Where was the gun that you saw?
24 A.  Wherever -- officer Gaines had it in his hand.  I don't
25    remember where it came from.

Page 100

1 Q.  Okay.  So you saw it when an officer already had
2    control of it?
3 A.  Correct.
4 Q.  You don't know where in the house it was retrieved?
5 A.  Do not.
6 Q.  But it was in officer Gaines's hand?
7 A.  Correct.
8 Q.  Okay.  Did you -- other than see it in his hand, did
9    you put it in your hand and look at it at all?
10 A.  Don't recall.
11 Q.  And when he say a revolver, what does that mean?  How
12    big?  I mean, is it like a handgun type thing?  It was
13    a small one, or is it like a long barreled revolver?
14 A.  I just remember him having a revolver.
15 Q.  Okay.  Do you know if there was any ammunition with it?
16 A.  No.
17 Q.  And there was no one in the house that you found,
18    correct?
19 A.  Nobody was there.
20 Q.  There was a -- do you remember filling out any
21    documents in your own handwriting?
22 A.  No.
23 Q.  Okay.  Do you recall hearing or seeing any .40 caliber
24    spent cases?
25 A.  No.

Christianna Bullock v.              **William Morrison**             **William Morrison -  Vol. I**
City of Detroit, Joseph Castro, William Morrison                                 **April 18, 2018**

---

Page 101

1  Q.  Did any of the officers carry .40 caliber?
2  A.  That's what we carry.
3  Q.  Twelve gauge shotgun shell casings, four of them, that
4      would be yours?  I'm looking at --
5  A.  What would be mine?
6  Q.  Well, I'm looking at the search work return, and it
7      says 12 gauge shotgun shell casings parentheses four.
8      Are those the shotgun shell casings are the four that
9      you shot at the home that day?
10  A.  I'm assuming they are, but I didn't confiscate them.
11  Q.  Okay.  What about .40 caliber spent casings?
12  A.  I didn't confiscate any .40 caliber spent casings.
13  Q.  And just for the record, a spent casings means a casing
14      that's been fired, so there's no gunpowder in there,
15      right?
16  A.  Correct.
17  Q.  And two handguns, were you ever aware of any handguns?
18  A.  I saw the one gun.
19  Q.  The revolver?
20  A.  Right.
21  Q.  Any idea of how old that revolver was?  Whether it's an
22      antique or new or...
23  A.  I just remember there -- him having a revolver.
24  Q.  Okay.  Did you fill out the firearms report in this
25      case?

---

Page 102

1  A.  No.  Generally, the person confiscating the gun would
2      either fill it out or have it -- direct someone to fill
3      it out, but I don't think I did.
4  Q.  Okay.  I'm going to show you these two firearms reports
5      that we got in discovery.
6  A.  Okay.
7  Q.  I mean, I can show you mine.  My question is: Do you
8      know who completed those?  I don't see a name on it or
9      initials.  That's why I'm asking.  Maybe you recognize
10      the handwriting.  I don't know.
11  A.  This report looks like it was completed by officer
12      Wawrzyniak.  I believe this is his handwriting.
13  Q.  And could you just, for the record, tell us what gun is
14      listed on that report that you think was done by that
15      officer?
16  A.  A Luger P38.
17  Q.  And you think -- you think -- and the record's clear
18      you're not a hundred percent -- but you think which
19      officer did that one?
20  A.  This looks like officer Wawrzyniak's handwriting.
21  Q.  Okay.  And then the other firearm report, you can't
22      tell?
23  A.  The other one, I'm not sure.
24  Q.  All right.  Are you a gun expert?
25  A.  No.

---

Page 103

1  Q.  Okay.  So a Luger model P38 out of Austria, do you know
2      if that's like an antique gun, or is that a gun that
3      you see commonly in the field?
4  A.  We see them.  I mean, we see all kinds of guns.  It's
5      not super common, but I've seen them before.
6  Q.  Most of the guns that you find in houses, do they have
7      the serial number still on them?  Or is it usually
8      scratched off or removed?
9  A.  No.  A majority of them have them on there.
10  Q.  Do you have any -- and, again, I'm just going to ask
11      you this because as I look at these reports, the one
12      firearms report indicates that the recovery location of
13      the Luger was 17151 Asbury, and the other report
14      indicates that the RTS from Italy was recovered from
15      17131 Winthrop.  How far away is Winthrop from Asbury?
16  A.  I don't know, because I'm not really familiar with this
17      particular area --
18  Q.  Okay.
19  A.  -- offhand.
20  Q.  Did you -- do you recall doing a raid on
21      September 2nd of 17131 Winthrop?
22  A.  Oftentimes -- we're a raid team for the east side of
23      the city, so if we were in the area, it's more than
24      likely to do an operation where we're doing a certain
25      amount of search warrants in that -- we're targeting

---

Page 104

1      that particular area, so it's possible that we did do a
2      raid at that location on the same day.
3  Q.  But recovery location, you're supposed to put the
4      address that you recover the weapon from, right?
5  A.  Sure.
6  Q.  Okay.  That's all I need to know.
7  A.  But, again, I didn't fill out that form.
8  Q.  Oh, I understand.
9          MR. MULLER: I think it's just a mistake.
10          THE WITNESS: And I don't know where that
11      form --
12  Q.  (By Mr. Cabot):  I know it's not yours.  That's why I
13      asked the question.  The record's very clear you only
14      think the one officer wrote it and don't have any idea,
15      but...
16  A.  But I don't even know where that form even came from,
17      so...
18  Q.  You never seen that form before?  You've seen that form
19      before surely, right?
20  A.  Which one?  I mean, I've seen a firearms report before.
21  Q.  Oh, okay.
22  A.  I don't know where that --
23  Q.  Well, I didn't make it up.  I got it from your
24      attorney.
25  A.  Yeah, well, I don't know.

---

Christianna Bullock v.
City of Detroit, Joseph Castro, William Morrison

William Morrison

William Morrison - Vol. I
April 18, 2018

Page 105

1  Q.  All right.
2  A.  There might be another page to this activity log, so
3       I -- looking at this --
4  Q.  Well, you know, you're looking at your attorney's file,
5       so I hope there's not another page to the activity log
6       because that's all you've got.  You think there's
7       something missing?
8  A.  I mean --
9  Q.  Well, you think there's something missing, don't you?
10  A.  You asked about another raid that was done.
11  Q.  Yeah.
12  A.  And if there could have been another raid done that
13       day.  This activity log doesn't necessarily --
14          MR. MULLER: It shows two raids.
15          THE WITNESS: Yeah.  So I don't know.
16  Q.  (By Mr. Cabot):  All right.  You don't know.
17          Did you ever -- were you ever aware that
18       there was a complaint made, a citizen complaint made
19       regarding this raid?
20  A.  Yeah, I think there was.
21  Q.  How did you find that out?  Did anybody interview
22       you?  Do a Garrity with you?  Or you just found out
23       once you got sued and talked to your lawyers or the
24       other attorney -- or the other officers?
25  A.  I want to say maybe -- I can't -- I just know that -- I

Page 106

1       believe that this person made a complaint.
2  Q.  Okay.  And why do you believe that?
3  A.  Because I think I had Garrity on that.  I can't be for
4       certain, but I think so.  And I'm not a hundred percent
5       sure on that.  I could be wrong, but I do know that
6       this person, I think, make a complaint.
7          MR. CABOT: Okay.  I don't have anything
8       further.  Thank you.
9          MR. MULLER: All right.  I'll have to ask for
10       a citizen complaint file, if there was one, okay?  I
11       didn't know your client made a complaint.
12          MR. CABOT: Are we on the record or off?
13          MR. MULLER: We're off.
14       (Deposition concluded at or about 2:25 p.m.)
15           *  *  *
16
17
18
19
20
21
22
23
24
25

Court Reporting Services
Phone (248) 535-8277 - courtreportingservices@ymail.com