# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CHRISTIANNA BULLOCK,

     Plaintiff,

                                      Case No. 17-12685

v.

                                        HON. DENISE PAGE HOOD

CITY OF DETROIT, WILLIAM
MORRISON, JOSEPH CASTRO,
and UNNAMED DEFENDANTS,

     Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#22]

## I.    INTRODUCTION

On September 2, 2015, during a raid of Plaintiff's home pursuant to a search warrant obtained by Defendant Joseph Castro ("Castro"), a City of Detroit ("City") Police Department ("DPD") officer, DPD officer and Defendant William Morrison ("Morrison") repeatedly shot and ultimately killed Plaintiff's dog ("Mandy"). Defendants recently filed a Motion for Summary Judgment [Dkt. No. 22], to which Plaintiff filed a response [Dkt. No. 26]. Defendants did not file a reply brief. A hearing on the Motion was held on January 9, 2019. For the reasons that follow, the Court grants in part and denies in part the Motion.

## II.    BACKGROUND

On August 31, 2015, a confidential informant met with Castro and DPD Officer Jennifer Tanguay ("Tanguay"). Castro and Tanguay arranged for the confidential informant to attempt to make a controlled buy at 17151 Asbury Park, Detroit, Michigan, Plaintiff's long time residence. Neither Castro nor any other member of the Major Violators Unit to which he belonged (nor anyone else) conducted any surveillance of Plaintiff's residence prior to attempting to make the alleged drug buy on August 31, 2015. Castro and Tanguay drove the confidential informant to Ashbury Park and parked three or four houses down the street from Plaintiff's residence. Castro and Tanguay remained in an undercover vehicle, approximately three to four houses away.

According to Castro, the entire transaction took place on the front porch of Plaintiff's house. Castro stated that someone opened the door and the transaction was made there on the front porch, but he never saw any exchange of money or drugs; he only saw movement. [Dkt. No. 26, Ex. C at 35-36] Castro was unable to give any description of the alleged "seller." [Dkt. No. 26, Ex. C at 25] Castro testified:

Q.    Does the CI ever go inside the home?

A.    The CI never went inside.

Q.    Did the alleged drug seller ever come out of the home passed the threshold of the front door?

A.    No.

2

Q.    Did you actually see the exchange of money or drugs.

A.    No.

[Dkt. No. 26, Ex. C at 35]

The confidential informant then returned to the undercover vehicle and gave Castro and Tanguay a description of the alleged seller and a packet of suspected heroin. The confidential informant never indicated: (a) whether the alleged seller was the homeowner or an individual who frequented the house; (b) how many times she had observed drug transactions taking place at this residence; and (c) that there was a vicious dog inside of the residence.  The same day, Castro obtained a search warrant for Plaintiff's residence based on this one controlled buy. [Dkt. No. 22, Ex. C]

Castro and his team members with the Major Violators Unit – all DPD officers – executed the search warrant two days later, on September 2, 2015.  After conducting a briefing, the Major Violators Unit arrived at Plaintiff's house and Officer Roy Harris announced the DPD's presence and purpose.  Officer Jeffery Wawrzyniak was assigned the halligan, which is a pry-bar tool used to pry off the security grate on the front of the door of Plaintiff's house.  Officer Bashawn Gaines was assigned the battering ram which was the tool used to breach the door.  Morrison was the point man, which meant that he held the shotgun, with his hand positioned by the trigger to enable him to make a split-second shot, and was the first person to enter the residence.

Castro was the second shotgun man, and his job was to assist Morrison with clearing the premises of any threats. Tanguay was assigned entry, and she was to help clear the house. Officer Ryan Paul was assigned the outer security and may have been inside the marked scout car.

Neither Morrison nor Castro recalled hearing a dog barking as they approached the premises. [Dkt. No. 26, Ex. B at 65, 67; Ex. C at 48] According to Castro, Gaines broke the door down and moved out of the way to allow Morrison and Castro to enter the residence. [Dkt. No. 26, Ex. C at 48] Castro entered behind Morrison, and he immediately looked to the left because Morrison was looking to the right. *Id.* at 48-49. Castro states that, at this point, he could no longer touch Morrison with his hand because Morrison was too far ahead. *Id*. at 51. Castro never saw Mandy, never saw a dog charge, and did not recall hearing a dog growl, but he heard Morrison yell "dog," and immediately heard shots. *Id.* at 50-52, 58, 61. Castro could not recall whether he saw blood in the house, stating, "At that time again, we were looking for bodies. We're not looking for small little minute things." *Id*. at 62.

Contrary to Castro's testimony, Morrison testified that he did not cross the threshold when the door was opened. [Dkt. No. 26, Ex. B at 72, 81] Morrison stated that Mandy, who was 12 to 15 feet away in the living room, looked in their direction and barked. *Id.* at 73-74. Morrison testified that Mandy barked, growled, made some

noise, and ran towards the officers while snarling and charging in Morrison's direction. *Id.* at 76, 79. Morrison immediately fired two shots at Mandy and only stopped firing when the dog retreated. *Id.* Mandy squealed after being shot, which (according to Morrison) is "what they do when you shoot them. They squeal." *Id.* at 81. Mandy, injured and bleeding, ran into the kitchen and then retreated into the basement, which (according to Plaintiff) was the dog's safe place. *Id.* at 80; Dkt. No. 26, Ex. A at 35. Morrison stated that the dog created an "imminent threat" at that time. Dkt. No. 26, Ex. B at 79. When Morrison went into the basement, he saw Mandy again. *Id.* at 84-85. Morrison claimed that the dog was limping and "was coming" at Morrison a second time when he shot her two more times and killed her. *Id.* at 85-88. Plaintiff's neighbors observed officers carry Mandy out of the house. Castro, together with Tanguay and Harris, transported Mandy to Detroit Public Works and threw her in a dumpster. Dkt. No. 26, Ex. M; Ex. C at 78-79; Ex. F.

Plaintiff filed a two-count Amended Complaint on October 10, 2017. Each count is a 42 U.S.C. § 1983 claim alleging a violation of the Fourth Amendment due to unreasonable search and seizure without probable cause.

## III. LEGAL STANDARD

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

## IV.   ANALYSIS

## A.     Unlicensed Dog

Defendants first argue that Plaintiff's Section 1983 claim for the illegal seizure of her dog (the shooting by Morrison and removal of Mandy by the Major Violators Unit) must be dismissed because Plaintiff did not have the requisite licenses for the dog from the State of Michigan or the City. The dog would then be contraband such that Plaintiff had no legitimate possessory interest in the dog for Fourth Amendment purposes. Only three days after Defendants' brief was filed, however, the Sixth Circuit Court of Appeals rejected that argument. *See Smith v. City of Detroit*, 2018 WL 4961285, at **5-6 (6th Cir. Oct. 15, 2018) ("*Smith 2018*") ("Michigan law makes clear that the owners [of unlicensed dogs] retain a possessory interest in their dogs" and are guaranteed process "even if the Officers had knowledge that the dogs were unlicensed, they still would not have been authorized to shoot them on the basis that they were contraband."). Accordingly, the Court rejects Defendants' unlicensed dog argument.

## B.     Qualified Immunity

Defendants next argue that Morrison is entitled to qualified immunity with respect to the seizure of the dog. As recently stated by the Supreme Court:

> The doctrine of qualified immunity shields officials from civil liability
> so long as their conduct does not violate clearly established statutory or
> constitutional rights of which a reasonable person would have known. A
> clearly established right is one that is sufficiently clear that every

reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citations and quotation marks omitted).

Qualified immunity is a two-step process. *Saucier v. Katz*, 533 U.S. 194 (2001). First, the Court determines whether, based upon the applicable law, the facts viewed in a light most favorable to the plaintiff show that a constitutional violation has occurred. Second, the Court considers whether the violation involved a clearly established constitutional right of which a reasonable person in the defendant's position would have known. *Saucier v. Katz, supra*.; *Sample v. Bailey*, 409 F.3d 689 (6th Cir. 2005). Only if the undisputed facts or the evidence, viewed in a light most favorable to the plaintiff, fail to establish a prima facie violation of clear constitutional law can this court find that the Defendants are entitled to qualified immunity. *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).

Once a government official has raised the defense of qualified immunity, the plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 494 (6th Cir. 2012) (citation omitted). A plaintiff also must establish that each individual defendant was "personally involved" in the specific constitutional violation.

*See Salehphour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998); *Bennett v. Schroeder*, 99 F. App'x 707, 712-13 (6th Cir. 2004) (unpublished) ("It is well-settled that to state a cognizable Section 1983 claim, the plaintiff must allege some personal involvement by the each of the named defendants").

The Sixth Circuit has held that "there is a constitutional right under the Fourth Amendment to not have one's dog unreasonably seized," *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (2016), and found this right to have been clearly established no later than in 2013, two years before Plaintiff's dog was seized by DPD officers. *Id.* at 567. The fact that Mandy was unlicensed (and therefore "contraband") does not alter the clearly established right to process before the dog is killed because the officers had no way of knowing if the dog was licensed or unlicensed just by seeing it. *See Horton v. California*, 496 U.S. 128, 136-37 (1990) (A warrantless seizure of contraband is not reasonable if it was not "immediately apparent" to an officer that the item was contraband). *See also Arizona v. Hicks*, 480 U.S. 321, 326-28 (1987); *Smith 2018*, 2018 WL 4961285, at *6. Accordingly, the Court concludes that, when viewing the facts in a light most favorable to Plaintiff, a clearly established constitutional violation occurred when the Major Violators Unit shot, killed, and removed Plaintiff's dog from her home.

The Court next must determine whether the seizure of Plaintiff's dog was

reasonable under the Fourth Amendment. Defendants' qualified immunity defense relies on the "undisputed fact that plaintiff's dog posed an imminent threat to officer Morrison and the raid crew," and the Court must objectively evaluate whether Mandy constituted an imminent threat from the perspective of a reasonable police officer at the time of the incident, without the benefit of hindsight. *Brown*, 844 F.3d at 567 (citing *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2020 (2014)).

"Imminent danger" is defined as "[a]n immediate, real threat to one's safety that justifies the use of force in self-defense," or "[t]he danger resulting from an immediate threatened injury sufficient to cause a reasonable and prudent person to defend himself or herself."[1] Imminent Danger, Black's Law Dictionary (10th ed. 2014). "This analysis allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Brown*, 844 F.3d at 567 (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). "[T]he standard we set out today is that a police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth

---

[1]DPD's policy regarding "Dangerous Animals" is that "[a]n officer may shoot a dangerous and/or rabid animal that is posing an imminent threat of danger to the officers or others only when bystanders are not in jeopardy." Dkt. No. 22, Ex. 11 at PgID 197 (DPD Manual, Section 304.2-4.6(1)).

Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety." *Brown*, 844 F.3d at 568.

The burden is on the plaintiffs to prove that the seizure was unreasonable. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Brown*, 844 F.3d at 568. Seizures are unconstitutional when they are more intrusive than necessary. *Florida v. Royer*, 460 U.S. 491, 504 (1983); *Brown*, 844 F.3d at 568. ("A seizure becomes unlawful when it is more intrusive than necessary").

Defendants assert that Morrison has testified that the dog posed an imminent threat to, and was attacking, Morrison and members of Major Violators Unit, which justified Morrison shooting the dog. Defendants are correct that Plaintiff was not home at the time of the raid, and no one else has directly countered Morrison's testimony that the dog barked, growled, snarled and charged at him upon entry into Plaintiff's house. But, Defendants ignore that the testimony of Castro, who was right behind Morrison when the raid team entered Plaintiff's house, does not align with Morrison's testimony on some key points.

Morrison testified that, when the front door was breached, he did not cross the threshold but looked to the right and saw the dog 12 to 15 feet away in the living room. Morrison testified that the dog barked, growled, made some noise, then ran and

charged toward the officers while snarling. Morrison states that he fired two shots at the dog and stopped shooting only when the dog retreated. Castro testified differently. Castro stated that, when the door was breached, he entered the house behind Morrison and looked to the right. Castro testified that Morrison was far enough in front of Castro that Castro could not touch Morrison with his hand. Castro stated that he did not see the dog charge or hear a dog bark or growl, but he heard Morrison say "dog" and shots fired immediately thereafter.

Based on the foregoing testimony, the Court finds that: (1) the only person testifying that the dog was barking, growling, and charging was Morrison, and (2) Morrison's partner – who was right behind him – did not see and, more important, did not hear the dog before Morrison fired shots at Mandy. The Court notes that it is undisputed that no member of the Major Violators Unit testified that, at any time prior to Morrison yelling "dog" and firing shots (including while the Major Violators Unit team was on the porch and Harris knocked and announced police presence), that he or she heard a dog barking or that Mandy was visible or audible. There was no testimony that the dog was barking or growling when the officers approached the residence or were on the porch and using the battering ram to force the door open. The Court notes that Plaintiff has testified that, although she had owned Mandy for four or five years, Mandy had never attacked, bit, or charged at anyone and, when the

dog became frightened, she would go into the basement and hide. There is no evidence that there was blood in the living room, even though this is where Morrison said he saw Mandy, though it is unclear where the dog was when he shot her. And, when Morrison was in the basement and shot Mandy again (which killed her), Morrison testified only that the dog was coming at him "limping" – but would not say that Mandy was charging toward him.

The Court concludes that, although there is no contradictory eyewitness, the testimony of Castro, the absence of anyone testifying that the dog reacted (barked or growled) when the officers were on the property (including the porch), the possible absence of blood in the living room, and the testimony of Plaintiff that the dog had never engaged in such behavior previously preclude the Court from determining as a matter of law that Morrison acted reasonably in shooting and killing the dog. The circumstances require a fact finder to make a determination regarding Morrison's credibility and the reasonableness of his actions.

Accordingly, the Court denies Defendants' qualified immunity defense regarding Morrison's shooting of Plaintiff's dog.

## C. The Search Warrant

Defendants argue that Castro is entitled to summary judgment because he obtained a valid warrant based on an affidavit that did not contain intentional or

reckless misrepresentations. As Defendants state, an illegal search claim requires that the plaintiff prove that the officer(s) lacked probable cause to search the plaintiff's residence. *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989). But, a search and seizure is per se unreasonable "unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *Horton*, 496 U.S. at 144. A facially valid warrant is subject to challenge if the officer obtaining the warrant made intentional or reckless misrepresentations or omitted information in the supporting affidavit when, but for the misrepresentations or omissions, probable cause would not have been found. *Donta v. Hooper*, 774 F.2d 716, 718 (6th Cir. 1985), *cert. denied*, 483 U.S. 1019 (1987). A constitutional violation may exist only if, in setting aside the misrepresentations or included omissions in the affidavit, the remaining facts no longer support probable cause. *Franks v. Delaware*, 438 U.S. 154 (1978).

Plaintiff first argues that the search warrant affidavit was based on a single controlled buy, which does not in itself establish probable cause to search the location. Citing *United States v. Smith*, 2004 U.S. Dist. LEXIS 32470, at *10 (E.D. Mich. 2004) ("*Smith 2004*"). In *United States v. Smith* 2004, as in this case, there was a single controlled buy, and the court stated:

> There was no information in the affidavit that the [confidential informant] had previously purchased drugs at the Minock address, or that

14

> he had ever been there before. There was no statement that he observed any guns or other drugs at the house. The [confidential informant] did not recount any conversation with the woman who sold him the drugs. Furthermore, the affidavit did not contain any other facts, such as police surveillance, unusual traffic patterns, previous sales at that address, or any other information which would suggest ongoing activity.

*Smith* 2004, 2004 U.S. Dist. LEXIS 32470, at *9. In this case, the alleged purchase by the confidential informant was made on the porch of Plaintiff's house and the confidential informant did not enter Plaintiff's house. The confidential informant did not indicate that he/she saw any guns or drugs in Plaintiff's house, nor was there any indication of the presence of a dog at the residence. Finally, the search warrant was executed two days after the single controlled buy was made.

As Plaintiff asserts, the warrant affidavit contained significant misrepresentations and/or omissions. First, although Castro testified that he was in a car parked approximately 3-4 houses down the street from Plaintiff's house, this information was omitted from the affidavit. Plaintiff asserts that, unless Castro had parked directly in front of Plaintiff's residence, he could not see what transpired at the front door of her residence. Second, Plaintiff states that the affidavit does not contain any indicia that drug trafficking had occurred at her residence or that she was a known drug dealer. Third, Plaintiff contends that there is no evidence that the confidential informant had ever: (a) observed a prior drug transaction at Plaintiff's house; (b) been inside Plaintiff's house; or (c) seen any drugs or drug paraphernalia in the house.

15

Fourth, the affidavit does not reflect that any other surveillance of Plaintiff's house was conducted before or after the single controlled buy or that the confidential informant attempted a second buy at Plaintiff's house. Fifth, as there was no evidence of drugs or drug paraphernalia when the search warrant was executed, Plaintiff suggests that even the reliability of the controlled buy is questionable.

The Court concludes that, when setting aside the misrepresentations or including omissions in the affidavit, the remaining facts no longer support probable cause for the warrant obtained by Castro. *Franks, supra.*

### D. *Monell* Liability

A municipal defendant can only be subject to direct liability if it causes constitutional harm to a plaintiff because the municipality "implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by" that body's officers. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." *Id.* at 694. A plaintiff cannot allege a viable claim based solely on vicarious liability or *respondeat superior*. *Id.* at 691. The municipality's policy (or absence of one) must be a "moving force" in the deprivation

of the plaintiff's constitutional rights and such policy must have arisen from "deliberate indifference" to the rights of its citizens. *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 508 (6th Cir. 1996).

A municipal "policy or custom" may be shown by presenting evidence that a failure to train and/or discipline officers constituted deliberate indifference on the part of municipal policymakers to the rights of its citizens. *City of Canton v. Harris*, 489 U.S. 378 (1989); *Berry v. City of Detroit*, 25 F. 3d 1342 (6th Cir. 1994). Merely showing that a particular officer is inadequately trained or that Plaintiff's injury could have been avoided had an officer had better training will not suffice to fasten liability to a municipality. *Canton*, 489 U.S. at 391. Summary judgment is warranted absent a showing that training deficiencies caused the constitutional deprivation alleged by plaintiff. *Id*. at 391.

In establishing a *de facto* municipal policy predicated on failure to train, a plaintiff must show that: (a) the municipality's training programs are inadequate to the tasks the officers are to perform; (b) the inadequacy is a result of the municipality's deliberate indifference; and (c) the inadequacy actually caused the Plaintiff's injury. *Berry*, 25 F.3d at 1346. Deliberate indifference is shown only where the need for more or different training is so obvious, and the inadequacy so likely to result in constitutional violations, that the policy makers can be reasonably said to have been

deliberately indifferent to this need. *City of Canton*, 489 U.S. at 390; *Barber v. City of Salem*, 953 F.2d 232, 236 (6th Cir. 1992). In failure to train claims, deliberate indifference also can be shown by establishing that the municipality was aware of widespread constitutional violations, yet ignored them such that the municipality could be said to have given tacit authorization to the officers' constitutionally aberrant conduct. *Berry*, 25 F.3d at 135.

Defendants argue that Plaintiff has not alleged or proffered evidence that a City custom, policy, or procedure was the moving force behind the alleged unconstitutional conduct. Defendant states that there was no evidence that: (a) the City was aware of unconstitutional seizures of dogs or seizures in general, such that it was obvious further training was necessary; or (b) the City's training was inadequate to the tasks Defendant officers (namely, Morrison) were to perform. Defendants also assert that the City has a written policy regarding dangerous animals that provides that an "officer may shoot a dangerous and/or rabid animal that is posing an imminent threat of danger to the officer or others only when bystanders are not in jeopardy." [Dkt. No. 22, Ex. L at 5]

Plaintiff contends that the City failed to train its officers on how to appropriately handle dogs when executing search warrants. Plaintiff relies on the testimony of officers that training on that subject had not happened in years. The

18

DPD officers' testimony on how long it had been since most recently receiving such training varied from approximately one to fifteen years. [Dkt. No. 26, Ex. C at 76; Ex. D at 7-8; Ex. E at 8-9; Ex. O at 7; Ex. Q at 6-7]. DPD officer Jeffrey Wawrzyniak (a member of the Major Violators Unit) was unable to identify when or if he had such training and testified that he did not know if there was such a policy in place. [Dkt. No. 26, Ex. O at 7; Ex. G (*Smith v. City of Detroit*, 2017 WL 3279170, at*4 (E.D. Mich. Aug. 2, 2017), reversed by *Smith 201*, 2018 WL 4961285 (citing Wawrzniak's testimony in that case involving a January 2016 shooting of dogs during a raid) ("The police officers conducting the search had not received any specific training on how to handle animal encounters during raids.")).

Plaintiffs argue that the policy of the DPD when confronting a dog during a search was to "either shoot or kick away," and the DPDs officers "have no other tool to deal with a dog." *Smith 2018*, 2018 WL 4961285, at *3 n.2. Plaintiff contends that law enforcement officers had other tools available to them. [*See* Dkt. No. 26, Ex. H (December 2013 U.S. Department of Justice publication titled "Police and Dog Encounters: Tactical Strategies and Effective Tools to Keep Our Communities Safe and Humane," and other manuals and videos produced by the U.S. Department of Justice made available to the DPD); Ex. P; Ex. S; Ex. X] Plaintiff asserts that DPD officers knew what to say after a dog shooting, which was to use the words in the

DPD policy and say that a dog posed an imminent harm to excuse a shooting, even if the dog did not actually pose an imminent harm. Plaintiff claims that supervisors of the DPD officers then ratified the shootings as justified and declined to discipline officers for the shootings.

Plaintiff asserts that she has produced extensive evidence that the City knew (or should have known) it had significant problems with: (1) the Major Violators Unit itself; and (2) DPD officers (in particular, Major Violators Unit members) shooting and killing pets. In reviewing the articles regarding these issues, the Court notes that the earliest date on any of the four articles cited by Plaintiff is November 15, 2016, over a year after Plaintiff's dog was shot. [Dkt. No. 26, Exs. T, V, W, Y] Plaintiff does provide one article that identifies issues with the Major Violators Unit dated February 14, 2015, more than six months prior to Plaintiff's dog being shot, but that article does not mention dogs being shot. [Dkt. No. 26, Ex. BB]

The Court finds that Plaintiff has not established a genuine dispute of material fact that, as of September 2, 2015, the City was aware of unconstitutional seizures of dogs, such that it was obvious further training was necessary. The Court grants summary judgment to the City on this claim.

## V.    CONCLUSION

Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment [Dkt. No. 22] is **GRANTED IN PART** and **DENIED IN PART**.

IT IS FURTHER ORDERED that the case will proceed against the individual Defendants and is DISMISSED as to the City.

IT IS ORDERED.

<div style="margin-left: 50%;">
s/Denise Page Hood
DENISE PAGE HOOD
UNITED STATES DISTRICT COURT
</div>

Dated: February 20, 2019